[No. S056364. Jan. 31, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
ALBERT JONES, Defendant and Appellant.

**COUNSEL**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Jessica McGuire and Jolie Lipsig, Deputy State Public Defenders, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Annie Featherman Fraser and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CHIN, J.**—A jury convicted defendant Albert Jones of the first degree murders of James H. Florville and Madalynne Florville with personal use of a deadly weapon and, as to both murders, under the special circumstances of robbery- and burglary-murder. It also found true a multiple-murder special-circumstance allegation. (Pen. Code, §§ 187, 190.2, subd. (a)(3), (17), 12022,

subd. (b).)[1] The court then found true allegations that defendant had one prior serious felony conviction and three prior convictions for which he had served separate prison terms. (§§ 667, 667.5.) After a penalty trial, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict (§ 190.4) and imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. THE FACTS

### A. Guilt Phase

The evidence showed that during the early morning hours of December 13, 1993, defendant, 29 years old at the time, and A.J., a 15-year-old boy, entered the Mead Valley home of James and Madalynne Florville, an elderly married couple, hog-tied them, stabbed them to death, and stole their property.

#### 1. Prosecution Evidence

Around noon on Monday, December 13, 1993, the bodies of 82-year-old James Florville and his 72-year-old wife, Madalynne Florville, were found in their Mead Valley home. They had been hog-tied with wire and died of multiple stab wounds. Their niece, Patricia Valenzuela, had spoken with Madalynne the evening before.

There was no sign of a forced entry into the residence. Blood was found in several places inside the residence and on an outside gate. No fingerprints were found inside the residence. The tip of what appeared to be a latex glove was found entwined in one of the knots in the wire wrapped around James's hands, and another small piece of a latex glove was found inside the residence near a sliding glass door. Property later determined to be missing from the Florville home included money and a small toy-like safe.

Rochel Timmons, also known as Auntie Roe, lived near the Florville home. A number of teenaged youths, including Jack Purnell, Ryan McElroy, Deborah Russell, and Timmons's daughter, Mary Holmes, spent much time at her house. Defendant did so also, although he was much older than the youths. Another teenager, A.J., also was part of the group.

Purnell, McElroy, Russell, and Holmes testified that defendant often talked to them about the group being a "clique," with defendant their leader. Defendant said that the boys, A.J. and Purnell, were his "disciples," and they were supposed to do what he said. He described members of the clique as

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

"insiders," and those who were not members as "outsiders." Insiders were not supposed to talk to outsiders about the clique. Defendant threatened harm to anyone who did so. All four of these witnesses testified that defendant also sometimes talked about the clique committing robberies. He did not normally talk about such things when adults were around, although Timmons overheard some talk about committing robberies.

On Sunday, December 12, 1993, the day before the murders, the group, including defendant, gathered at Timmons's house to go to church. At some point, defendant talked to A.J. and Purnell in a back room about a robbery he said the three of them were to commit. Russell, McElroy, and Holmes overheard some of this conversation. Russell testified she heard defendant "describing a residence and doors and fences, and talking about what they were supposed to get and . . . who would go first and second and third." They were supposed to get "[s]ome money that was supposed to be in safes." A.J. was to go first followed by Purnell. When they were leaving, A.J. would go first, then Purnell. Defendant "would leave last to make sure everybody else got . . . away okay." Holmes testified that defendant said "he was going to go up to the door and tell them that his mother had a heart attack and that he needed to call the paramedics." Purnell was supposed to tie them up and put them in a closet. A.J. was "to go around the back and come through a window." Defendant also said they "were going to get some money," and A.J. "was going to look for the stuff."

Later that day, defendant drove a group that included A.J., Purnell, Russell, and Holmes to a store to buy some nylons. On the way back to Timmons's house, defendant slowed down while driving by the Florville home. He talked to A.J. and Purnell about robbing that home. Russell testified that defendant "pointed out the sliding glass door and the fences, and told them to look at their surroundings." He said they could hop the fences. Purnell testified that when they passed the home, defendant "point[ed] out the escape route and how we was going to go and stuff." Holmes testified that defendant told A.J. to look at the premises and everything around him.

Purnell also testified that later that day, back at Timmons's house, defendant talked more about the robbery that he, Purnell, and A.J. were to commit. Defendant said "that the old White people in the corner might have money and guns and stuff," and "they might have a safe." Defendant said that "he was going to go up to the door," and Purnell "was supposed to follow him and [A.J.] was supposed to follow" Purnell. Defendant said that once inside, Purnell was "supposed to tie the people up." They were "to look for some money and the safe and some guns," and "stab the people or something" if they saw "one of us." Defendant mentioned that they were to have gloves and

rope—the gloves so as to leave no fingerprints, and the rope so they "could tie the people up." Ultimately, Purnell went home and did not participate in the intended robbery.

Another youth in the neighborhood, Dorell Arroyo, 14 years old at the time of the murders, was an eyewitness to some of these events. He lived in the area and knew defendant and others in the neighborhood, although he was not considered a member of defendant's clique. Arroyo spent the night of the murders in a trailer near the Florville home. Sometime early in the morning of December 13, 1993—Arroyo did not have a watch but thought it was around 5:00 to 6:00 a.m.—he looked out the trailer window and observed defendant's car. He had known defendant for about two years and had seen defendant's car many times.

Arroyo stepped outside to get a drink of water. He observed defendant's car stop near the Florville home. He saw defendant and A.J., whom he had known all his life, get out of the car. A.J. jumped over the gate to the Florville property and walked out of sight. Defendant walked to the front of the gate, and then went inside the gate towards the front of the Florville home and out of Arroyo's view. Then Arroyo saw the sliding glass door of the Florville home move. A short time later, Arroyo observed defendant come back out the gate and walk towards his car, scratching his hands as he did so. He also saw A.J. throw a square object over the gate, then go over the gate himself and put the object into the car. Defendant entered the driver's door and A.J. the passenger door of the car, and Arroyo watched as the car drove to Timmons's house. Arroyo estimated to the police that these events took about 15 to 30 minutes to occur.

After observing these events, Arroyo walked to Dakota Whitney's nearby house and sat on her couch. Whitney estimated the time of his arrival to be around 6:00 a.m., perhaps a bit earlier or later. Whitney testified that Arroyo seemed scared. Arroyo testified he tried to tell Whitney what he had seen, but she said "she didn't want to hear it." A day or so after these events, Arroyo told his mother what he had seen. His mother dialed 911, and the police came. Arroyo told them what he had seen. He had not done so until then. The police investigator who spoke with Arroyo testified that Arroyo was terrified about talking to him; Arroyo said that defendant would kill him if he found out that he was speaking with the police. Arroyo told the police that he had seen A.J. throw a square object over the fence before the police became aware that a small square safe was missing from the Florville home.

Considerable evidence was presented regarding the lighting conditions at the time Arroyo said he observed these events. There were no streetlights in the area, so it was dark, but it was possible to see in the area at night. The

sun would not have been up yet at that time, but the evidence indicated it was beginning to get light. Arroyo testified that a motion detector light next door, which a police investigator described as bright, was turned on. He said the sun was not yet out, but he could see. The lighting was like when he got up for school; it was "misty." Timmons testified that a porch light was on that morning at her home. The distance from where Arroyo stood when he observed these events to where he said defendant's car was parked was 166 feet eight inches, and to the Florvilles' gate was 127 feet. It was an additional 39 feet eight inches from the gate to the front of the residence.

Mary Holmes testified that the morning of the murders, while on her way to a bus stop to go to school, she observed a bloody latex glove in Timmons's front yard. She "panicked" because she was afraid of defendant and took the glove into the Timmons house, where she flushed it down the toilet. At trial, Holmes could not remember what time she found the glove. At various times, she had said it was around 6:05 a.m. and around 6:20 a.m. Investigators later recovered a latex glove from the top of the septic tank on Timmons's property.

Judy Johnson, defendant's girlfriend and A.J.'s aunt, testified that the morning of the murders, defendant drove her to her place of employment. Defendant stayed with her a few minutes but left before she clocked in at 5:23 a.m. A.J. was sleeping on the couch in their home when they left. When she returned home that day, defendant had done the laundry, including washing his and A.J.'s clothes. A police investigator testified that it took about 16 minutes to drive the 10 miles from Judy Johnson's place of employment to defendant's home and about 11 minutes to drive the 7.9 miles from defendant's home to the murder scene.

Deborah Russell testified that on the day of the murders, she received a telephone call from defendant. He said he had heard that the people in the residence had been killed—"that they had been tied up and thrown in the closet and shot." He told her to be careful because "next it could be me."

Later on the day of the murders, Arroyo and others, including defendant, gathered at Timmons's house. Timmons testified that at the time, Arroyo "stuck" to her "like a fly," which was unusual. Russell and Holmes testified that Holmes told defendant she had found the glove and flushed it down the toilet. Defendant asked A.J. what he had done with his gloves. A.J. responded that he had removed them and thrown them in the back of the car. Defendant also told Holmes, "Good job," or, as Russell described it at trial, told Holmes she "had done the right thing by flushing them down the toilet." Ryan McElroy also heard defendant and A.J. say in each other's presence that "they lost a glove." McElroy and Arroyo also testified that defendant

threatened Arroyo, saying, as McElroy put it, that Arroyo had to "tie up people or do whatever [A.J.] say to do or he will kill him or do something bad to his loved ones."

On the Tuesday after the murders, defendant and A.J. spoke further with some of the youths at a funeral. Purnell testified that in defendant's presence A.J. told Purnell that "they did the lick," by which he meant the robbery. Defendant remained silent. Ryan McElroy testified that defendant told her that the Florvilles "should have cooperated," and then they would not have gotten stabbed.

Rochel Timmons testified that around 4:00 a.m. on the Wednesday after the murders, she received a telephone call from Judy Johnson. Defendant also got on the other end of the line and told her "that he need[ed] me to help him with his alibi." She cut him off because she did not want to talk about it.

In addition to the latex glove found in Timmons's septic tank, investigators found a similar latex glove by a fence inside the yard at defendant's residence, and two similar latex gloves in a trash bag in defendant's pickup truck. None of these gloves was missing a fingertip or thumbtip, so none could have contributed the latex glove tip found at the crime scene.

A teacher at the school that A.J. had attended testified that sometime during the November before the murders, she observed A.J. walk out of a classroom with some latex gloves. She told him to put the gloves back in the classroom, and he did.

Regarding the question of intent to steal, the prosecution presented evidence that on August 3, 1985, in Vernon, California, defendant and a cohort robbed three men of their money at gunpoint.

### 2. Defense Evidence

Defendant presented evidence regarding the lighting conditions in the area of the crime around the relevant time in an attempt to show it was so dark that Arroyo could not have seen what he said he saw, evidence of other acts of misconduct and prior statements to impeach some of the prosecution witnesses, and expert testimony regarding the time of the victims' deaths and other evidence to try to show that the crime was committed earlier than Arroyo's testimony indicated.

### 3. Rebuttal

The prosecution presented expert evidence to rebut the defense expert evidence regarding the time of death.

## B. *Penalty Phase*

### 1. *Prosecution Evidence*

The prosecution presented evidence of defendant's other criminal activity and his criminal convictions.

On July 21, 1992, defendant and a second man committed an armed robbery of a store in Delano, in Kern County. Deborah Russell testified that on December 12, 1993 (the day before the murders of this case), defendant threatened to kill her and a friend of hers because she had gone to a store with the friend. On September 23, 1995, while in a two-person cell, defendant assaulted his cellmate with his fists, bloodying him. In 1985, defendant was convicted of three counts of robbery (related to the Vernon robbery proven at the guilt phase), of selling marijuana, and of inducing a minor to sell marijuana. In 1989, he was convicted of being a felon in possession of a firearm. In 1990, he was convicted of possession of a controlled substance.

Additionally, members of the victims' family testified about the victims and the impact their deaths had on them.

### 2. *Defense Evidence*

Defendant presented the testimony of two Riverside County Sheriff's deputies assigned to work at the county jail, who testified that defendant had always been respectful and never aggressive towards them or any other deputies. Anthony Casas, a former associate warden at San Quentin prison and deputy director of the Department of Corrections and Rehabilitation, reviewed defendant's prison records and found no indication in those records that he had engaged in any aggressive or violent behavior while in prison towards either staff or inmates.

Connie Jones, defendant's sister, testified about his youth growing up in Los Angeles and Oregon. Defendant was the seventh of nine children. She communicated with defendant after he went to prison. He had a daughter who was seven years old at the time of trial. Jones identified photographs of defendant's daughter at various ages.

## II. DISCUSSION

### A. *Prosecutor's Use of Peremptory Challenges*

Defendant contends the prosecutor improperly challenged three African-American prospective jurors for racial reasons—two during selection of the

seated jurors and one during selection of alternate jurors. We disagree. Although the trial court found that defendant had stated a prima facie case of improper use of peremptory challenges, the record supports its ultimate conclusion that the prosecutor excused the jurors for race-neutral reasons.

### 1. *Factual Background*

The record indicates that defendant is African-American; the victims were White. During jury selection, two African-American prospective jurors were excused for hardship on stipulation of both parties. Another African-American prospective juror, M.S., was excused for cause because of her views favoring the death penalty. During voir dire questioning by defense counsel, M.S. stated she could not return a verdict of life if defendant were found guilty of the charged crimes. Under questioning from the prosecutor, she said that, although she favored the death penalty, she could consider a life without parole verdict in an appropriate case. However, on further questioning from the court, she reiterated that she could not consider a life sentence. Accordingly, defendant challenged her for cause, the prosecutor submitted the matter without argument, and the court granted defendant's challenge.

In selecting the main jury, the prosecutor exercised 16 peremptory challenges. His ninth and 12th challenges were to African-American Prospective Jurors G.G. and N.C. The jury that was ultimately selected, before the selection of alternates, included one African-American. At this point, defendant objected to the peremptory challenges. The prosecutor said he did not have his jury notes with him and was not prepared to state his reasons for his challenges at that time. The court decided to rule on the question after the alternate jurors had been selected. While selecting six alternate jurors, the prosecutor exercised six peremptory challenges, one to an African-American prospective juror, D.L. The last five of these challenges, including D.L.'s, came after defendant had exhausted his peremptory challenges. The six alternates actually selected included one African-American.

Thereafter, out of the presence of the jury, defendant objected to the prosecutor's excusal of the three African-American prospective jurors "under the *Batson* line of cases and the *Wheeler* line of cases." (See *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).) When asked to respond, the prosecutor first noted that one African-American juror whom he had rated highly as a possible juror had been excused for cause, and that two other African-American jurors he had also rated highly remained on the jury, one as an alternate. He also stated that he had been reluctant to stipulate to the hardship excusals of two other

African-American prospective jurors because he would have liked to see them on the jury. He then explained his reasons for the peremptory challenges at issue.

Regarding N.C., the prosecutor primarily was concerned with the prospective juror's answer on the juror questionnaire to the question whether he or a close friend or family member had been accused of a crime. N.C. wrote that his son had been so accused. The prosecutor stated, "I think it was attempt murder or murder." (In fact, N.C. had stated on the questionnaire only that his son had been accused of a crime and that it went to trial. He left blank questions regarding what the crime was and what happened.) The prosecutor explained why this was a concern to him: "When defense counsel kept talking about being falsely accused, I watched him, and his responses troubled me on that. Just watching his body language and his response to that. And I took that in conjunction to [the person N.C. had said had been accused of a crime], which I believed to be his son. [¶] Finally, when the defense attorney asked him . . . if he would help [defendant], I saw a pause—a gigantic pause. I could have counted to 25, I think, before he answered that question. And when he finally answered it, I didn't remember what the answer was, but at that point I was sure that it was something he mulled over. And he mulled over it so seriously that he could not be a juror in this case." The court asked the prosecutor, "So your primary concern there is because a family member had been charged with a serious offense?" The prosecutor responded that the "conjunction" of these factors "pushed [N.C.] over on the scale."

Regarding G.G., the prosecutor said that one factor was that his adult children were unemployed. That was a concern, but that factor alone "wouldn't have been a final concern, because he had some other good things going for him. [¶] There was another concern I had with him, and that was that he is in charge of buses that bus in that very area where this crime occurred. And what concerned me about that was, there may be some dispute on timing. [¶] The defense has provided me with a videotape of a route from, I think, the defendant's place to the victim's place, and I was real concerned about his opinions regarding those routes. [¶] Likewise, what may be an issue in the case is how sunlight is in the morning. And because my witness is going to say that this happened at that time of morning before the sun comes up. And I had concerns about this bus driver, as well as other bus drivers, in this particular business. [¶] Finally, when defense counsel talked about scapegoats, and I asked [G.G.] about a scapegoat, at first it appeared to me his response was, 'Yes, this case could be about a scapegoat,' even though there had been no evidence at all. That led me to think this particular juror was buying into something that the defense was trying to get across with their voir dire questions. So at that point it was when I finally made up my mind that he wouldn't be an acceptable juror either. [¶] Before that time, I would

say he was, in my opinion—despite some strong things, he did have some very strong, sound things that I did like. But that scapegoat area troubled me a lot. I had the belief that he was buying into some sort of defense theory, without hearing any evidence, just based upon the voir dire questioning."

Regarding D.L., the prosecutor explained that he regarded her "as a close one. And . . . the People kicked a lot of jurors that . . . I believe were close. [¶] As I saw it, I had good, strong jurors further down the line, and I had to weigh them in my mind against jurors down the line. [¶] [D.L.] had some very, very positive aspects. There were a couple of things that alerted me right away. She left question No. 20 blank. Again, that is the question about 'Do you know or have anybody in your family that's been accused?' . . . I was real concerned about her leaving that particular question blank. [¶] She answered another question that concerned me. And again, it wasn't a final thing. It was an additional thing. She mentioned her church was A.M.E. [stated as "African Methodist Episcopal" on the questionnaire], and I assume that it's the A.M.E. church up in L.A. I constantly see A.M.E. on television. They are constantly controversial, and I don't particularly want anybody that's controversial on my jury panel. [¶] Another thing that I responded to was, when she was asked about being falsely accused, she almost had a defensive, combined with an overbearing manner. And two things occurred to me: One, she was buying into some of this 'falsely accused' business . . . . But also, at the same time, I have many witnesses. The witnesses are black kids, and they are just kind of rough. And I had the feeling that she would look down upon those kids, and I can't have a juror that does that. [¶] . . . And also, at the time that [D.L.] came up—I think that was in the final six-pack, I'll call it—and I had three of my best jurors that I liked best in that same six-pack. And when I saw the defense used up all of theirs, I figured I could gain my best jurors by kicking some of these other jurors who . . . I thought were pretty good jurors. Because I was down I think, six to one, which gave me a chance to pick up some very strong jurors, in my mind, such as [two who were actually selected as alternates]."

The prosecutor summarized his thinking: "So that was the thought process with those three particular jurors. I would tell the Court that I had some sort of system. I rated the . . . the two black jurors on the panel as my highest ranking and had no intentions of ever kicking those two jurors."

When the prosecutor finished explaining his peremptory challenges, the court invited defense counsel to respond. He declined to do so. The court then clarified that it had found that defendant had stated a prima facie case of improper use of peremptory challenges. However, it found, "now having heard from the prosecution, it appears that the reasons that these persons were excluded from the jury was for nonracial purposes and racially neutral purposes." Accordingly, the court denied defendant's motion.

### 2. *Analysis*

■ "Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to excuse prospective jurors based on race . . . . [¶] The *Batson* three-step inquiry is well established. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613 [80 Cal.Rptr.3d 98, 187 P.3d 946], fn. omitted (*Lenix*).)

Here, the trial court found that defendant had made a prima facie showing, so the burden shifted to the prosecutor to explain his conduct. "A prosecutor asked to explain his conduct must provide a ' "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.' [Citation.] 'The justification need not support a challenge for *cause*, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.] Nevertheless, although a prosecutor may rely on any number of bases to select jurors, a legitimate reason is one that does not deny equal protection. [Citation.] Certainly a challenge based on racial prejudice would not be supported by a legitimate reason." (*Lenix, supra*, 44 Cal.4th at p. 613.)

■ The prosecutor gave a detailed, specific, race-neutral explanation of each of the challenges in question. "At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her." (*Lenix, supra*, 44 Cal.4th at p. 613, fn. omitted.)

The trial court denied defendant's motion, implicitly finding the prosecutor's explanation credible and expressly finding his reasons to be race neutral. "Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a

prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' " (*Lenix, supra*, 44 Cal.4th at pp. 613–614.)

As we recognized in *Lenix*, the United States Supreme Court has also emphasized the deference a reviewing court must give to the trial court's determination. " '[R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness, inattention), making the trial court's first-hand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie " 'peculiarly within a trial judge's province,' " [citations], and we have stated that "in the absence of exceptional circumstances, we would defer to [the trial court]." [Citation.]' " (*Lenix, supra*, 44 Cal.4th at p. 614, quoting *Snyder v. Louisiana* (2008) 552 U.S. 472, 477 [170 L.Ed.2d 175, 128 S.Ct. 1203].) The high court has also "made it clear that in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." (*Snyder v. Louisiana, supra*, at p. 478.)

Relying largely on *People v. Silva* (2001) 25 Cal.4th 345, 385–386 [106 Cal.Rptr.2d 93, 21 P.3d 769], defendant argues that we should not defer to the trial court's ruling because, after hearing from the prosecutor, it simply denied the motion without further discussion, which, defendant contends, shows that it did not make a sincere and reasoned attempt to evaluate the prosecutor's credibility. We disagree. As we explained in response to a similar argument in *People v. Lewis* (2008) 43 Cal.4th 415, 471 [75 Cal.Rptr.3d 588, 181 P.3d 947], the "court denied the motions only after observing the relevant voir dire and listening to the prosecutor's reasons supporting each strike and to any defense argument supporting the motions. Nothing in the record suggests that the trial court either was unaware of its duty to evaluate the credibility of the prosecutor's reasons or that it failed to fulfill that duty." Here, the court asked the prosecutor one question during his explanation. Additionally, it invited defense counsel to comment on the prosecutor's explanation. Defense counsel declined to comment, thus suggesting he found the prosecutor credible. Under the circumstances, the court was not required to do more than what it did.

Additionally, and contrary to defendant's argument, the statistics are not particularly troubling. The prosecutor did peremptorily challenge 60 percent of the African-American prospective jurors who were called into the box—three out of five—and a little less than a third of the non-African-American prospective jurors called into the box—19 out of 62. On the other hand, the prosecutor used three of 22 peremptory challenges against African-Americans before accepting a jury, including alternates, that contained two African-Americans out of 18. Thus, he challenged African-Americans at a rate only slightly higher than their percentage on the jury. If he had exercised one fewer challenge against African-Americans, he would have challenged them at a rate lower than their percentage on the jury.

These numbers are not nearly as troubling as those in *Snyder v. Louisiana, supra,* 552 U.S. at page 476, where the prosecutor challenged all five prospective African-American jurors, resulting in none on the actual jury, or in *Miller-El v. Dretke* (2005) 545 U.S. 231, 240–241 [162 L.Ed.2d 196, 125 S.Ct. 2317], where the prosecutor challenged nine of 10 prospective African-American jurors, resulting in only one on the actual jury. Moreover, the prosecutor told the court that he would have liked to have had on the jury the two African-American jurors who were excused for hardship, as well as M.S., who was excused for cause due to her views on the death penalty. We cannot evaluate the credibility of the prosecutor's statement regarding the jurors excused for hardship, although the trial court could do so. Even on a cold record, however, we can evaluate the credibility of the prosecutor's statement regarding M.S. Under questioning from defense counsel, M.S. stated she could not return a verdict of life if defendant were found guilty. The prosecutor then engaged in questioning obviously designed to do what is called "rehabilitate" the juror—that is, to elicit answers that would make her not subject to a challenge for cause. He elicited the response that she *could* consider a verdict of life in an appropriate case. The prosecutor's effort to rehabilitate M.S. ultimately failed, and the court excused her for cause at defendant's request, but the record shows that the prosecutor wanted to keep her on the jury. Thus, the prosecutor clearly wanted on the jury three of the six African-American jurors who were excused for cause or were called into the box—50 percent—and said he wanted on the jury five of the eight who were excused for hardship or cause or were called into the box—62.5 percent.

■ All of these are probative circumstances, although they are not dispositive, especially considering the small numbers involved. (*People v. Cleveland* (2004) 32 Cal.4th 704, 734 [11 Cal.Rptr.3d 236, 86 P.3d 302].) In *Cleveland,* the question was whether a prima facie case existed, but these circumstances are also relevant to the third stage of the *Wheeler/Batson* inquiry. "While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in

exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection." (*People v. Turner* (1994) 8 Cal.4th 137, 168 [32 Cal.Rptr.2d 762, 878 P.2d 521], quoted in *People v. Stanley* (2006) 39 Cal.4th 913, 938, fn. 7 [47 Cal.Rptr.3d 420, 140 P.3d 736].) The prosecutor's acceptance of the jury containing an African-American and of the alternates containing another one, as well as his desire to have had as jurors the three who were excused for hardship or cause, together with the fact that he challenged only three African-Americans out of 22 total peremptory challenges, "strongly suggests that race was not a motive in his challenge[s]." (*Lenix, supra,* 44 Cal.4th at p. 629.)

But "a single race-based challenge is improper." (*People v. Cleveland, supra,* 32 Cal.4th at p. 734.) Accordingly, we examine defendant's specific factual arguments, while keeping in mind the overall picture before us. He challenges the prosecutor's explanation as to each of the three prospective jurors in question.

Regarding G.G., defendant claims the prosecutor's concern that G.G.'s children were unemployed was not sincere or legitimate because he did not question him about this concern. Here, there were lengthy juror questionnaires supplemented by substantial voir dire questioning of the prospective jurors by the court and the parties. Thus, this is hardly a case of perfunctory examination of prospective jurors. (*People v. Bell* (2007) 40 Cal.4th 582, 598–599, fn. 5 [54 Cal.Rptr.3d 453, 151 P.3d 292].) The prosecutor questioned G.G. extensively about defense counsel's "scapegoat" theory. It is not suspicious that the prosecutor did not further question him about all other concerns. A party is not required to examine a prospective juror about every aspect that might cause concern before it may exercise a peremptory challenge. Concern over unemployed children is race neutral, and the record gives no reason to believe this explanation was not sincere.

Defendant also challenges the prosecutor's explanation that he was concerned that G.G. was "buying into" the defense's scapegoat theory. He notes that G.G. *said* all the right things in this regard. But the record shows that, while questioning the jury panel generally about the scapegoat theory, the prosecutor noticed some reaction from G.G. that concerned him and caused him to question G.G. further. Thus, it appears the prosecutor's concern was based on G.G.'s body language. "Experienced trial lawyers recognize what has been borne out by common experience over the centuries. There is more to human communication than mere linguistic content. On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact." (*Lenix, supra,* 44 Cal.4th at p. 622.)

Relying on *Snyder v. Louisiana, supra,* 552 U.S. 472, defendant argues that a reviewing court may not rely on body language to uphold a challenge. In *Snyder,* the prosecutor gave one nondemeanor reason for challenging a particular prospective juror (Brooks) and also said the juror appeared nervous. The high court concluded for many reasons that the nondemeanor reason was pretextual. The court then held that when the only nondemeanor reason given (i.e., the only reason a reviewing court can evaluate) is shown to be pretextual, a reviewing court should not uphold the challenge solely because the prosecutor also gave a demeanor reason, at least not when the trial court does not specifically cite that demeanor in its ruling. (*Id.* at pp. 479, 485.) The court explained that under the circumstances of that case, including the "absence of anything in the record showing that the trial judge credited the claim that Mr. Brooks was nervous," and the pretextual nature of the other reason the prosecutor cited, "the record does not show that the prosecution would have pre-emptively challenged Mr. Brooks based on his nervousness alone." (*Id.* at p. 485.) But the high court never suggested that demeanor is not a valid basis for a peremptory challenge. Here, the record does not show that the nondemeanor reasons the prosecutor gave were pretextual.

Defendant asks us to engage in comparative juror analysis regarding the prosecutor's concern that G.G. was a bus driver in the area. The prosecutor said he "had concerns about this bus driver [(i.e., G.G.)], as well as other bus drivers." Defendant claims this concern was insincere because the prosecutor did not similarly challenge two White jurors who were also bus drivers in the area. Defendant did not raise this issue at trial, but he does so for the first time on appeal. Despite problems inherent in conducting comparative juror analysis for the first time on appeal—including the difficulties of comparing what might be superficial similarities among prospective jurors and trying to determine why the prosecutor challenged one prospective juror and not another when no explanation was asked for or provided at trial—both the high court and this court have done so on request. (See *Snyder v. Louisiana, supra,* 552 U.S. 472; *Miller-El v. Dretke, supra,* 545 U.S. 231; *Lenix, supra,* 44 Cal.4th at p. 622.)[2]

---

[2] Although the high court engaged in comparative juror analysis for the first time on appeal in *Snyder,* it cautioned "that a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." (*Snyder v. Louisiana, supra,* 552 U.S. at p. 483.) The court engaged in such analysis in that case only because there "the shared characteristic, *i.e.,* concern about serving on the jury due to conflicting obligations, was thoroughly explored by the trial court when the relevant jurors asked to be excused for cause." (*Ibid.*)

We also note that, although the high court relied on comparative juror analysis as part of its reasons for not deferring to the lower courts in both *Snyder* and *Miller-El,* in neither case was

Defendant's proffered comparative juror analysis is not very probative in this case. The prosecutor candidly stated he was concerned about all of the bus drivers, but he was not asked why he did not peremptorily challenge the others. The record strongly suggests race-neutral reasons why he chose to accept the others despite his concern that they were bus drivers. For example, the two bus drivers the prosecutor did not challenge said they were "strongly in favor" of the death penalty. G.G. rated himself as only "moderately in favor" of the death penalty. An attorney must consider many factors in deciding how to use the limited number of peremptory challenges available and often must accept jurors despite some concerns about them. A party concerned about one factor need not challenge every prospective juror to whom that concern applies in order to legitimately challenge any of them. "Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding." (*Lenix, supra,* 44 Cal.4th at p. 624.) The comparison here provides no basis to overturn the trial court's ruling.

■ Defendant argues that the prosecutor did not cite G.G.'s views on the death penalty as a reason for challenging him, and that we are limited to considering the reasons the prosecutor gave. We agree with defendant that in judging why a prosecutor exercised a particular challenge, the trial court and reviewing court must examine only the reasons actually given. "If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." (*Miller-El v. Dretke, supra,* 545 U.S. at p. 252.) But we disagree with defendant's further argument that we may not consider reasons not stated on the record for accepting *other* jurors. The prosecutor was not asked why he did not challenge the other bus drivers. When the trial court finds a prima facie case of improper use of peremptory challenges, the prosecutor must state the reasons for those challenges "and stand or fall on the plausibility of the reasons he gives." (*Ibid.*) But no authority has imposed the additional burden of anticipating all possible unmade claims of comparative juror analysis and explaining why *other* jurors were *not* challenged. One of the problems of comparative juror analysis not raised at trial is that the prosecutor generally has not provided, and was not asked to provide, an explanation for nonchallenges. When asked to engage in comparative juror analysis for the first time on appeal, a reviewing court need not, indeed, must

that analysis the sole reason for its conclusion that the challenges in question were racially motivated. The comparative juror analysis in both cases merely supplemented other strong evidence that the challenges were improper. (*Snyder v. Louisiana, supra,* 552 U.S. at pp. 476, 482–483; *Miller-El v. Dretke, supra,* 545 U.S. at pp. 240–241, 253–266.)

not turn a blind eye to reasons the record discloses for not challenging other jurors even if those other jurors are similar in some respects to excused jurors.

Regarding N.C., defendant argues that the prosecutor misstated N.C.'s answer to the question about his son having been accused of a crime. We agree that the record does not support the prosecutor's statement: "I think it was attempt murder or murder." The prospective juror did not specify on the questionnaire what the crime was. Although relevant, this circumstance is not dispositive. No reason appears to assume the prosecutor intentionally misstated the matter. He might have based what he thought on information he obtained outside the record. Or he may simply have misremembered the record. The prosecutor had to keep track of dozens of prospective jurors, thousands of pages of jury questionnaires, and several days of jury voir dire, and then he had to make his challenges in the heat of trial. He did not have the luxury of being able to doublecheck all the facts that appellate attorneys and reviewing courts have. Under the circumstances, it is quite plausible that he simply made an honest mistake of fact. Such a mistake would not show racial bias, especially given that an accurate statement (that N.C. wrote that his son had been accused of, and tried for, a crime but left the rest of the answer blank) would also have provided a race-neutral reason for the challenge.

The purpose of a hearing on a *Wheeler/Batson* motion is not to test the prosecutor's memory but to determine whether the reasons given are genuine and race neutral. "Faulty memory, clerical errors, and similar conditions that might engender a 'mistake' of the type the prosecutor proffered to explain his peremptory challenge are not necessarily associated with impermissible reliance on presumed group bias." (*People v. Williams* (1997) 16 Cal.4th 153, 189 [66 Cal.Rptr.2d 123, 940 P.2d 710].) This "isolated mistake or misstatement" (*People v. Silva, supra*, 25 Cal.4th at p. 385) does not alone compel the conclusion that this reason was not sincere.

Defendant also asks us to compare the prosecutor's challenge to N.C. with his failure to challenge another juror who stated on the questionnaire that her brother had been tried in Okinawa in 1978 for assault and battery. But being accused of a crime in Japan is different from being accused in this country. The other juror's questionnaire suggested she favored the death penalty more strongly than did N.C. Moreover, the other juror apparently did not present the other concerns the prosecutor expressed about N.C. Just as with G.G., this comparative juror analysis for the first time on appeal has little probative value.

Defendant also argues the prosecutor misstated the circumstances surrounding N.C.'s pause before he answered defense counsel's question

whether he would favor defendant. We disagree. Defense counsel asked N.C. whether he "would have a tendency of trying to protect [defendant] on a case like this because you're black." N.C. answered, "Yeah. In a way." On further questioning, N.C. said this answer related to earlier questioning regarding defendant's hairstyle, and he later stated he would not protect defendant just because he was African-American. The prosecutor asked N.C. why he had hesitated so long before answering whether he would protect defendant. N.C. did not deny he hesitated, but responded, "I was just trying to get it right," and reiterated that he could be fair to the prosecution. This further questioning dispelled any reason to excuse the juror for *cause*, but it did not automatically dispel any legitimate concern the prosecutor might have had. N.C.'s original statement that he might try to protect defendant may, as defendant now argues, have been based on a misunderstanding. But the circumstance that a prospective juror hesitates over whether he would favor (or try to protect) one side provides a valid reason for the opposing side to use a peremptory challenge out of caution. A peremptory challenge is not a challenge for cause but may be exercised whenever a legitimate reason appears for a party to worry whether that juror will be impartial.

Defendant also claims the prosecutor's concern about N.C.'s "body language" in response to defense counsel's talk about someone being falsely accused was not credible. He notes that no one directly asked N.C. about this point. But this is exactly the sort of reliance on body language that the trial court, but not a reviewing court, may and must evaluate. Defendant also claims the reliance on body language was insufficient because the prosecutor did not go on to describe exactly what the body language was. But an explanation need not be that specific. The prosecutor's overall explanation regarding N.C. was clear and reasonably specific. We see no reason to overturn the trial court's finding that the stated reasons for this challenge were sincere and race neutral.

Regarding D.L., defendant challenges the prosecutor's reasons on several grounds, none convincing. The prosecutor candidly stated that he found her a "close" call because she had some good qualities. But he excused her (and several others) because he believed he had even better potential jurors who had not yet been called, and defendant had already exhausted his peremptory challenges. This explanation is plausible and race neutral.

Defendant claims the prosecutor's concern that she was a member of the African Methodist Episcopal Church—which he assumed was the one in Los Angeles (D.L.'s questionnaire indicated she had lived in Los Angeles, was currently working in Los Angeles, and had been working there for seven years)—was itself discriminatory. But the prosecutor did not excuse her, as defendant claims, just because she belonged to a largely African-American

church, but because this particular church was, in his view, "constantly controversial," and he did not "particularly want anybody that's controversial on my jury panel." Defendant also contends this explanation constituted impermissible discrimination based on religious affiliation. He did not object on that basis at trial and may not do so for the first time on appeal. (*People v. Cleveland, supra,* 32 Cal.4th at p. 734.) Moreover, the prosecutor did not excuse her because of her religious views but because he believed she belonged to a controversial organization.

Defendant also claims that the prosecutor's "feeling that she would look down upon those kids," whom he described as "kind of rough" "black kids," was itself impermissible racial stereotyping. But the record shows that the prosecutor was concerned that *this particular prospective juror* might look down on his witnesses—due possibly to her "overbearing manner"—not that *all* African-Americans would look down on rough, youthful African-American witnesses. Defendant also argues that the prosecutor's concern about D.L.'s failure to answer question No. 20 was insincere because he asked her no questions about it. Again, a party need not inquire into every possible concern that party may have regarding a prospective juror.

Defendant also challenges the validity of the prosecutor's concern that D.L. might be "buying into some of this 'falsely accused' business." But the concern was based on her "defensive" and "overbearing manner." Again, the trial court must, but a reviewing court cannot, evaluate this explanation, and we must defer to the trial court's determination. Defendant also asks us to compare the prosecutor's challenge to D.L. with his failure to challenge two White jurors about whom, he claims, the prosecutor should have had similar concerns. Any such comparison proves nothing for several reasons. First, defendant asks us to make a false comparison. The other two jurors were part of the originally chosen jury. D.L. was being considered as an alternate. When the prosecutor had to decide whether to challenge D.L., it was too late to challenge either of the other two jurors. In deciding about D.L. (and others among the alternates), the prosecutor felt he had the luxury of challenging good jurors in the hope of obtaining even better ones. Thus, even if we (or the prosecutor at trial) were to view D.L. as more favorable to the prosecution than either of the other two, the prosecutor never had a choice between D.L. and them. Moreover, the record gives no indication the other two had body language comparable to what concerned the prosecutor about D.L. Finally, the other two's answers on other points, for example, their stronger views in favor of the death penalty, suggested reasons to keep them, but not D.L., on the jury even if the prosecutor was concerned about them in this one respect.

Finally, defendant disagrees with the Attorney General's argument that the prosecutor legitimately relied on the circumstance that challenging D.L. gave

him the "chance to pick up some very strong jurors," such as two who later became alternate jurors. Defendant asks us to compare D.L. with the two alternate jurors the prosecutor specifically mentioned, who identified themselves as "White" and "Caucasian (Portuguese)," respectively. He argues that D.L. was a stronger prosecution juror than those two. But the record suggests reasons the prosecutor could sincerely have believed the two would be stronger prosecution jurors than D.L. For example, one of the alternate jurors stated on the juror questionnaire that he was "moderately in favor" of the death penalty. Additionally, he stated that if "the defendant is found guilty of taking a life then his life should end," and expressed strong agreement with the statement that "[a]nyone who kills another person should always get the death penalty," explaining that "the person has taken a life." The second alternate juror stated that he was strongly in favor of the death penalty. D.L. said she was moderately in favor of the death penalty and disagreed somewhat with the statement that "[a]nyone who kills another person should always get the death penalty." Defendant cites other statements of these jurors and makes various arguments to support his view that the prosecutor should have considered D.L. to be a stronger prosecution juror than the other two, but he provides no reason for this court to conclude that the trial court was compelled to find insincere this portion of the prosecutor's explanation for challenging D.L.

In sum, "a prosecutor, like any party, may exercise a peremptory challenge against anyone, including members of cognizable groups. All that is prohibited is challenging a person *because* the person is a member of that group." (*People v. Cleveland, supra,* 32 Cal.4th at p. 733.) The record here shows that the prosecutor exercised his peremptory challenges to obtain a jury as favorable to his side as possible (just as defendant presumably exercised *his* peremptory challenges to obtain a jury as favorable to *his* side as possible), and not to eliminate African-Americans for racial reasons. This case presents no exceptional circumstances requiring us to overturn the trial court's ruling. (See *Snyder v. Louisiana, supra,* 552 U.S. at p. 477.)

### B. Guilt Phase Issues

#### 1. Admission of Evidence of a Prior Robbery

Defendant contends the trial court erred in admitting evidence of the 1985 robbery in Vernon. We conclude it acted within its discretion.[3]

---

[3] With respect to this and other claims on appeal, defendant argues that the asserted error also violated various of his constitutional rights. Before trial, the court agreed that any objection by defendant would be deemed to include an objection on federal and state constitutional grounds. The constitutional claims do not invoke facts or legal standards different from those defendant asked the trial court to apply but merely assert that the alleged

### a.  *Factual Background*

Before trial, the prosecutor moved to admit evidence of three of defendant's prior crimes: (1) the 1985 robbery in Vernon; (2) the 1992 robbery in Delano; and (3) a 1984 crime in which defendant used a 15-year-old juvenile to help him sell marijuana. The robberies were offered to prove defendant's intent to steal, and the 1984 crime to show defendant's pattern of using juveniles while committing crimes. Defendant objected to the evidence, and the court held a hearing.

The court excluded evidence of the 1984 crime. Because a question arose about the sufficiency of the evidence concerning the 1992 Delano robbery, the court ordered the prosecutor not to use it pending a further hearing. Accordingly, evidence of that robbery was not admitted until the penalty phase. But the court did admit evidence of the 1985 Vernon robbery "[o]n the issue of intent, and using the logic and reasoning of the *Ewoldt* decision." (See *People v. Ewoldt* (1994) 7 Cal.4th 380 [27 Cal.Rptr.2d 646, 867 P.2d 757].) Later the court stated that, in admitting the evidence, it had weighed its probative value against its prejudicial effect under Evidence Code section 352. It did, however, exclude as unduly inflammatory evidence that defendant had told the Vernon victims that he had killed before. Defendant filed a petition for writ of mandate in the Court of Appeal challenging the trial court's ruling, which the appellate court summarily denied.[4] Thereafter, defendant asked the trial court to change its ruling due to purported factual misstatements in the prosecutor's original offer of proof. After hearing argument, the court refused to do so, still finding "sufficient similarities that it can come in for the purpose of intent."

Accordingly, the jury heard the following evidence. Around noon on Saturday, August 3, 1985, three men, Raymond Latka, Robert Valdez, and Randy Vasquez, were leaving a furniture store in Vernon where they worked. A white LeBaron stopped abruptly in front of them, and two men, one identified as defendant, got out. Defendant pointed a blue Luger handgun at them, said it was a robbery, demanded their money, and threatened to kill them. The other man collected money from the three, hitting Vasquez in the process. They collected Valdez's wallet, a wad of money from Vasquez, and six dollars from Latka. Defendant was convicted of his participation in the robbery.

errors were also constitutional violations. Because we find no error, we necessarily also find no constitutional violation. Accordingly, we provide no separate constitutional discussion. (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].)

[4] A summary denial of a pretrial petition for extraordinary relief does not establish law of the case precluding consideration of the issue on appeal following final judgment. (*Kowis v. Howard* (1992) 3 Cal.4th 888, 891 [12 Cal.Rptr.2d 728, 838 P.2d 250].) Accordingly, the denial of the pretrial petition does not affect our resolution of this issue on appeal.

The prosecutor discussed the Vernon robbery briefly in his argument to the jury, stressing that he had presented the evidence solely to show defendant's intent to rob. The court instructed the jury on the limited purpose for which the jury could consider the evidence of the robbery. It told the jury not to consider the evidence to prove that defendant has a bad character or has a disposition to commit crimes, but only on the question of intent to commit robbery or burglary, and even then only if it first found beyond a reasonable doubt that defendant was one of the perpetrators of the charged crime at the Florville residence.

### b. *Analysis*

Evidence of other crimes is not admissible merely to show criminal propensity, but it may be admitted if relevant to show a material fact such as intent. (Evid. Code, § 1101; see *People v. Kelly* (2007) 42 Cal.4th 763, 783 [68 Cal.Rptr.3d 531, 171 P.3d 548].) To be admissible, there must be some degree of similarity between the charged crime and the other crime, but the degree of similarity depends on the purpose for which the evidence was presented. The least degree of similarity is needed when, as here, the evidence is offered to prove intent. (*People v. Kelly, supra,* at p. 783.) As we have often explained, the recurrence of a similar result tends to negate an innocent mental state and tends to establish the presence of the normal criminal intent. (*Ibid.*; see *People v. Ewoldt, supra,* 7 Cal.4th at p. 402.) The determination whether to admit other crimes evidence lies within the trial court's discretion. (*People v. Kelly, supra,* at p. 783.) We see no abuse of discretion.

The Vernon robbery and the Florville home invasion were not particularly similar, but they contained one crucial point of similarity—the intent to steal from victims whom defendant selected. Evidence that defendant intended to rob the Vernon victims tended to show that he intended to rob when he participated in the Florville crimes. This made the evidence relevant on that specific issue, which is all that the court admitted it for.

Defendant contends the court abused its discretion in not finding the evidence unduly prejudicial. (See Evid. Code, § 352.) We disagree. The court carefully exercised its discretion. It excluded evidence of the 1984 crime and of one inflammatory feature of the Vernon robbery—evidence that defendant told the victims he had killed before. The evidence was presented quickly, and the parties did not dwell on it. The Vernon robbery was not particularly inflammatory when compared with the horrendous facts of the charged crimes. The court instructed the jury on the proper purpose for which it could consider the evidence, which we presume the jury followed. (*People v. Lindberg* (2008) 45 Cal.4th 1, 25–26 [82 Cal.Rptr.3d 323, 190 P.3d 664].) The fact that defendant was convicted of the Vernon robbery reduced any

prejudicial effect, as the jury would not be tempted to convict defendant of the charged offenses in order to punish him for the previous crime, and defendant's identity as one of the robbers had already been established. (*People v. Balcom* (1994) 7 Cal.4th 414, 427 [27 Cal.Rptr.2d 666, 867 P.2d 777].)

■ Defendant argues that only identity was actually disputed at trial, and he did not dispute the perpetrator's intent to rob at the Florville residence. Even if this is so, it is not dispositive. "[T]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense." (*Estelle v. McGuire* (1991) 502 U.S. 62, 69 [116 L.Ed.2d 385, 112 S.Ct. 475].) "The prosecution, of course, must prove each element of its case. Defendant's assertion that his defense to the two charges was bound to focus upon identity, and not intent, would not eliminate the prosecution's burden to establish both intent and identity beyond a reasonable doubt." (*People v. Soper* (2009) 45 Cal.4th 759, 777 [89 Cal.Rptr.3d 188, 200 P.3d 816].) The trial court properly exercised its discretion to admit this limited evidence for this limited purpose.

We also conclude that any error would have been harmless. Defendant's identity as one of the Florville robbers—as well as his leadership position—was established by five witnesses who knew him well: Jack Purnell, Ryan McElroy, Deborah Russell, Mary Holmes, and Dorell Arroyo. They knew defendant well enough that they could not reasonably have been *mistaken* in identifying him. Their testimony was highly incriminating and mutually supportive. To posit defendant's innocence, the jury would essentially have had to conclude that all five committed perjury to have him falsely convicted, even though no credible reason appears why any—much less all five—would have done so. The five tended to be reluctant witnesses, and some lied to the police originally—either to avoid involvement or to protect defendant—but these circumstances do not show that they lied at trial to incriminate him. The circumstantial evidence, although not particularly strong by itself, also tended to corroborate these witnesses. Moreover, for the reasons explained above, the evidence of the Vernon robbery was not particularly prejudicial, especially given the limiting instruction the court gave the jury. Accordingly, we find no reasonable probability the verdict would have been more favorable to defendant had the court excluded evidence of the Vernon robbery. (*People v. Carter* (2005) 36 Cal.4th 1114, 1152 [32 Cal.Rptr.3d 759, 117 P.3d 476].)

### 2. *Admission of Evidence Regarding the Latex Gloves*

Defendant contends the court erred in admitting the evidence that a teacher had observed A.J. walk out of a classroom carrying some latex gloves the November before the crime. When defendant objected to the evidence, the

court held a hearing, and the witness testified outside the jury's presence as an offer of proof. After the hearing, the court admitted the evidence that was actually presented, but it excluded evidence that shortly after the teacher observed A.J. walk out with the gloves, the gloves in the classroom were missing.

Defendant argues the evidence was irrelevant and, if relevant, should have been excluded as unduly prejudicial. "The trial court has broad discretion both in determining the relevance of evidence and in assessing whether its prejudicial effect outweighs its probative value." (*People v. Horning* (2004) 34 Cal.4th 871, 900 [22 Cal.Rptr.3d 305, 102 P.3d 228].) The court carefully exercised its discretion when it admitted some of the proffered evidence and excluded some of it. The challenged evidence was, by itself, not particularly compelling, but other evidence established that the perpetrators had used latex gloves in the Florville residence, presumably so as to not leave fingerprints. Evidence that A.J. had tried to take some latex gloves from a classroom shortly before the Florville crime tended logically to connect him to that crime. Because the witnesses generally said that defendant committed the crime with A.J., evidence connecting A.J. to the crime also logically connected defendant to that crime. Moreover, the evidence had virtually no prejudicial effect. It was presented quickly, and it is unlikely the jury would tend to convict defendant of a double murder out of outrage that A.J. had walked out of a classroom with latex gloves. We see no abuse of discretion.

### 3. *Exclusion of Videotape Evidence*

Defendant sought to admit two videotapes of the crime scene taken one and two years after the crime to impeach Dorell Arroyo's testimony. The court excluded the tapes. Defendant contends the court erred. We disagree.

#### a. *Factual Background*

When defendant sought to present the videotapes, the district attorney objected on the basis that a camera does not show what the eye can see. In support of his objection, he cited *People v. Boyd* (1990) 222 Cal.App.3d 541 [271 Cal.Rptr. 738]. In response, defendant said he was not offering the tapes to show the lighting conditions at the time of the crime but merely to show the amount of *natural* light available at that time. He argued that such evidence was relevant to impeach Arroyo's testimony that natural light was present. The court held an evidentiary hearing outside the presence of the jury.

Defendant presented evidence through two witnesses who did the videotaping that the two tapes were recorded, beginning around 5:15 a.m. each of the

two days, under natural lighting conditions that were similar to the conditions at the time of the crime, and that the tapes reflected what those witnesses could see under those natural lighting conditions. The prosecutor attempted to cross-examine the first defense witness regarding whether the lighting conditions at the time of the taping, including artificial lighting, were similar to the lighting conditions that existed at the time of the crime. Defendant objected that he was not attempting the show the actual lighting conditions but only the natural lighting, and that, therefore, questions about artificial lighting were irrelevant. He argued that Arroyo had testified that he could see due to natural light; therefore, evidence regarding the natural lighting was relevant to impeach Arroyo, even if it did not show the actual lighting conditions. He suggested the court give the jury a limiting instruction on the limited purpose for which he offered the tapes.

Because Arroyo had also testified that a motion detector light was on next door to the crime scene, the court observed, "How does one determine, articulate or not, what is the source of the light? I mean, all they know is they can see." The court expressed the view that the relevance of the tapes would be to illustrate what Arroyo could or could not see. After watching and listening to the tapes, the court also believed that the videotapers were able to see things that the camera did not show. It noted that "the naked eye can see what the camera doesn't—or at least what the tape doesn't pick up." It was concerned that it would mislead the jury for it "to see basically a blank screen for 45 minutes." When defense counsel offered to "fast-forward it," the court responded, "For whatever time it takes is, in my opinion—based upon what I saw and what I heard, is deceiving the jurors because they cannot see on the tape what obviously someone at the scene could see." The court overruled defendant's objection to the prosecutor's asking questions regarding the actual lighting conditions at the time of the taping. Thereafter, the witnesses' testimony made clear that the tapes did not reflect the actual lighting conditions, including artificial lights, that prevailed at the time of the crime.

The prosecutor indicated that he had a witness waiting who could testify concerning video cameras and, after defendant finished presenting his evidence, he offered to call that witness. The court, however, stated it was ready to rule on the question without an additional witness, so the prosecutor never presented his witness. After hearing argument, the court excluded the tapes. Regarding "the issue as to what [Arroyo] was able to see," the court found "that these particular tapes would be unduly confusing and misleading to the jury on that most key issue." Regarding possible impeachment of Arroyo's testimony, the court excluded the tapes under Evidence Code section 352. It explained it would "allow testimony to impeach him as to what time he was able to see by natural light. But to use these tapes to try to impeach him with that, I think, would unduly influence the jury, that this is a replication of what the actual light was, and we don't know that. I don't know that anybody

could have replicated that. So I think the use of these tapes would be terribly inappropriate. Under [section] 352, I am not going to allow them." The court stressed, however, that the witnesses could testify about what they could see; it was just excluding the tapes themselves.

### b. *Analysis*

In *People v. Gonzalez* (2006) 38 Cal.4th 932 [44 Cal.Rptr.3d 237, 135 P.3d 649], we upheld the exclusion of a videotape offered to show the lighting conditions at the time of the crime. We explained that " '[t]o be admissible in evidence, an audio or video recording must be authenticated. [Citations.] A video recording is authenticated by testimony or other evidence "that it accurately depicts what it purports to show." [Citation.]' (*People v. Mayfield* (1997) 14 Cal.4th 668, 747 [60 Cal.Rptr.2d 1, 928 P.2d 485].) 'In ruling upon the admissibility of a videotape, a trial court must determine whether: (1) the videotape is a reasonable representation of that which it is alleged to portray; and (2) the use of the videotape would assist the jurors in their determination of the facts of the case or serve to mislead them.' (*People v. Rodrigues*[ (1994) 8 Cal.4th 1060,] 1114 [36 Cal.Rptr.2d 235, 885 P.2d 1].)" (*People v. Gonzalez*, at p. 952.)

In both *People v. Gonzalez, supra*, 38 Cal.4th at pages 952–953, and *People v. Boyd, supra*, 222 Cal.App.3d at pages 565–566 (the case the prosecutor cited to the trial court), the trial court properly excluded a videotape offered to show the lighting conditions because the videotape did not, in fact, accurately show those conditions. In this case, defendant does not claim the tapes he offered accurately reflected the actual lighting conditions. In fact, the record shows that the tapes did not reflect those conditions. Defendant made no attempt, for example, to account for the artificial light that the evidence showed existed at the time of the crime. But defendant seeks to distinguish *Gonzalez* and *Boyd* on the basis that he did not offer the tapes to show what the lighting conditions were, but only to show the amount of *natural* light that was available. He argues that Arroyo had testified that there was some natural light available and that the tapes would impeach this testimony by showing there was no natural light.

The court acted within its discretion in excluding the evidence offered for this very narrow purpose. "A party who seeks to introduce experimental evidence must show as foundational facts that the experiment was relevant, that it was conducted under conditions the same as or substantially similar to those of the actual occurrence, and that it 'will not consume undue time, confuse the issues, or mislead the jury [citation].' [Citation.] The party need not, however, show that the conditions were absolutely identical. [Citations.] Under Evidence Code section 352, the trial court has wide

discretion to admit or reject experimental evidence. We reverse decisions to admit or exclude such evidence only when the trial court has clearly abused its discretion." (*People v. Boyd, supra*, 222 Cal.App.3d at pp. 565–566.)

Here, after viewing the tapes, the court was concerned that they did not accurately show what the naked eye could actually see even under the conditions of the taping. In *People v. Gonzalez, supra*, 38 Cal.4th at page 952, there was expert testimony that "the human eye is able to see things in the dark better than a video camera . . . ." The record here does not contain such evidence, possibly because the prosecutor did not present its expert witness when the court indicated it was ready to rule without that testimony. But even if we assume that the videotape did reflect what the eye could actually see under only *natural* lighting, the trial court had discretion to exclude it. This is because Arroyo and other witnesses testified that there was artificial light as well as natural light. As the trial court observed, a witness will know whether and what he could see, based on whatever source of light exists, but would not ordinarily distinguish how much of the actual lighting was due to natural light and how much to artificial light. Because the record shows that artificial light existed at the time of the crime, the trial court could, in its discretion, reasonably conclude that trying to isolate one portion of the available light could serve only to confuse, not assist, the jury. The trial court permitted defendant to present evidence regarding the lighting conditions at the time of the crime, and he presented substantial such evidence. But it also reasonably found that the videotapes themselves would not assist the jury in determining the facts but would instead serve to mislead them. (*People v. Rodrigues, supra*, 8 Cal.4th at p. 1114.) We see no abuse of discretion.

Defendant argues that this court has repeatedly upheld the admission of videotapes when the *prosecution* offered them over defense objection (e.g., *People v. Mayfield, supra*, 14 Cal.4th 668; *People v. Rodrigues, supra*, 8 Cal.4th 1060), and complains that videotapes seem to be excluded only when *defendants* offer them. He suggests a double standard exists in favor of the prosecution. But nothing in *Mayfield* or *Rodrigues* supports admission of the videotape here. Rather, videotapes are admissible within the court's discretion when they assist the jury, and they are excludable within the court's discretion when they do not assist the jury. Here, the trial court reasonably exercised its discretion to exclude the tapes. In other cases, such as *Mayfield* and *Rodrigues*, the court reasonably exercised its discretion to admit tapes.

In response to defendant's complaint that all of the rulings regarding videotapes seem to favor the prosecution, we note that generally the prosecution may not obtain appellate review of adverse evidentiary rulings; only

defendants may do so in criminal cases.[5] Accordingly, by the nature of things, most rulings reviewed on appeal in criminal cases—on this as well as other points—favor the prosecution. Rulings favorable to criminal defendants generally do not receive appellate review or even, for the most part, mention in an appellate opinion. Thus, the fact that the trial court rulings discussed on appeal generally favor the prosecution merely reflects the realities of appellate review in criminal cases, not the supposed pro-prosecution proclivities of this or any other court.

In this case, the court made many rulings favorable to defendant that are not raised on appeal. For example, over prosecution objection, it exercised its discretion to admit much evidence of specific instances of bad conduct to impeach the prosecution witnesses under our then recent decision of *People v. Wheeler* (1992) 4 Cal.4th 284 [14 Cal.Rptr.2d 418, 841 P.2d 938]. We are reviewing only rulings adverse to defendant, but that does not mean the court continually ruled against him.

### 4. *Denial of Motion to Have the Jury View the Crime Scene*

Defendant moved to have the jury view the crime scene. (See § 1119.) He argued that such a viewing would help the jury judge the distances involved and otherwise aid in determining Arroyo's credibility. He also asked that, if the court denied the motion, he be allowed at least to have one Officer Whitford testify. (Later, defendant did call Officer Whitford as a witness. She presented a diagram of the area and testified regarding various distances.) The prosecutor opposed the motion. He argued that the existing evidence was sufficient, and that "there's so much of a time difference now that we don't know how the bushes are, we don't know how the trees are. There's substantial changes several years later."

When defense counsel stated that defendant would not want to be present at the requested viewing, the court agreed that security would not be an issue. But the court denied the motion for other reasons: "[W]e have a number of photographs that were taken of the general scene . . . taken on the day of the incident. In fact, even showing the police officers still there and the police tape, I think the caution tape, still in place, combining with the . . . aerial photographs to give us some perspective of distance. Putting that together also with the various descriptions that we've had, I don't feel that a . . . jury view is really necessary to get a perspective of what persons were able to . . . see and . . . what the conditions were like. I think we have sufficient information before us that a jury view is just not necessary."

---

[5] In some circumstances, the prosecution may, on a defendant's appeal, obtain review of adverse rulings in order to secure affirmance of the judgment. (See *People v. Braeseke* (1979) 25 Cal.3d 691, 701 [159 Cal.Rptr. 684, 602 P.2d 384].) But those circumstances are exceptions to the general rule.

Defendant contends the court erred. "The standard of review for a trial court's decision to grant or deny a request for a jury view is abuse of discretion. [Citation.] When the purpose of the view is to test the veracity of a witness's testimony about observations the witness made, the trial court may properly consider whether the conditions for the jury view will be substantially the same as those under which the witness made the observations, whether there are other means of testing the veracity of the witness's testimony, and practical difficulties in conducting a jury view." (*People v. Price* (1991) 1 Cal.4th 324, 422 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

Here, the court did not abuse its discretion. Over two years had elapsed between the time of the crime and the trial, and the court could reasonably believe that photographs taken the day of the crime, and the extensive other evidence the jury received—much of it offered by defendant—concerning the area, the relevant distances, and the lighting conditions, obviated any need for a jury view. We find no error.

## C. *Penalty Phase Issues*

### 1. *Admission of Evidence of Uncharged Robbery*

Defendant contends the court erred in admitting evidence of the 1992 Delano robbery.

#### a. *Factual Background*

At the penalty phase, the prosecution presented evidence in aggravation of defendant's other criminal activity involving force or violence, including the 1992 robbery in Delano. (§ 190.3, factor (b).) Before it did so, defendant moved for the court to hold an evidentiary hearing outside the jury's presence to determine whether there was sufficient evidence to support a jury finding that he participated in that robbery. In support of the motion, he cited *People v. Phillips* (1985) 41 Cal.3d 29, 72, footnote 25 [222 Cal.Rptr. 127, 711 P.2d 423]. In response, the prosecutor argued that an evidentiary hearing was not required.

At the hearing on defendant's motion, defense counsel stated that defendant had pleaded guilty to a misdemeanor count of receiving stolen property in the incident, and that robbery charges had been dismissed.[6] Then the prosecutor made an offer of proof. He stated that one of the three eyewitnesses to the robbery had selected defendant's photograph out of a lineup, although with

---

[6] The fact that a defendant has pleaded guilty to receiving stolen property and that the robbery charges were dismissed does not preclude the prosecution from proving the robbery at the penalty phase. (*People v. Rodrigues, supra*, 8 Cal.4th at p. 1157.)

only about 50 percent certainty. There were no other eyewitness identifications. However, defendant and a second person were apprehended from a nearby residence within a "very, very short period of time" of the robbery. Property "with names on it that was stolen shortly beforehand" was found inside that residence. The prosecutor argued that, although primarily circumstantial, the evidence was sufficient to present to the jury. After reviewing *People v. Phillips, supra*, 41 Cal.3d 29, the court ruled that the offer of proof was a sufficient inquiry into the sufficiency of the evidence, and that an evidentiary hearing was not required. It denied the motion for an evidentiary hearing and admitted the evidence.

Accordingly, the jury heard the following evidence. On July 21, 1992, around 8:30 a.m., two men committed an armed robbery at the Fairway Market in Delano. One man, stipulated not to be defendant, approached Kyong Hui Yang at the cash register and robbed her of her purse, which contained her identification. The second man approached Jose Plancarte at the meat department, pointed a pistol at his head, hit him in the head with a weapon, took property from his pockets, and locked him in the bathroom. Maria Gamez also witnessed the robbery and observed the man with the pistol. Gamez managed to run from the store and call the police. The robbers then left the store, fleeing in the direction of Garces Highway.

Gamez selected defendant's photograph from a lineup as one of the participants, but said she was only about 50 percent certain. She did not select anyone from a personal lineup, but she identified defendant at trial. Neither Yang nor Plancarte made any identification.

The police received the call of a robbery at 8:31 a.m., and several police officers responded promptly. One citizen told the police that the robbers had entered his apartment at 302 Garces Highway, about one-tenth of a mile from the Fairway Market. Other citizens pointed the police towards that apartment complex. Two police officers, Drake Massey and Jeffrey Nacua, approached the apartment in question, arriving within five minutes of the robbery, according to Massey, and within "[m]oments" according to Nacua. The two could tell that someone was inside the apartment, and they waited for a SWAT team to arrive and deal with the situation. Massey and Nacua positioned themselves so they could see if anyone entered or left the apartment. Until the SWAT arrived in the early afternoon, no one left or entered the apartment. Eventually, a SWAT team arrived and arrested two men, one of them defendant, who were inside the apartment. After his arrest, defendant said his name was John Paul Jones.

Property taken in the robbery, including Yang's purse and a wallet containing her identification, was found in the apartment after defendant's arrest.

### b. *Analysis*

Defendant contends the court erred in two respects. First, he argues that, before admitting the robbery evidence, the court should have held an evidentiary hearing outside the presence of the jury regarding the sufficiency of the evidence. "In *Phillips*, a plurality of this court suggested 'that in many cases it may be advisable for the trial court to conduct a preliminary inquiry before the penalty phase to determine whether there is substantial evidence to prove each element of the other criminal activity.' (*People v. Phillips, supra*, 41 Cal.3d at p. 72, fn. 25 (plur. opn. of Reynoso, J.).)" (*People v. Young* (2005) 34 Cal.4th 1149, 1209 [24 Cal.Rptr.3d 112, 105 P.3d 487].) But we have since clarified that this preliminary inquiry is discretionary and, if held, need not be an *evidentiary* hearing. If the court does elect, in its discretion, to conduct such an inquiry it may be based on an offer of proof. (*People v. Young, supra*, at p. 1209; *People v. Hart* (1999) 20 Cal.4th 546, 649 [85 Cal.Rptr.2d 132, 976 P.2d 683]; *People v. Clair* (1992) 2 Cal.4th 629, 677–678 [7 Cal.Rptr.2d 564, 828 P.2d 705].) Here, we see no abuse of discretion. The trial court did conduct a preliminary inquiry into the sufficiency of the evidence. It was not additionally required to "conduct[] an evidentiary hearing that might have required witnesses to testify once at the hearing and again at the penalty phase." (*People v. Hart, supra*, at p. 649.)

Defendant also argues that there was insufficient evidence to allow the jurors to conclude beyond a reasonable doubt that he was one of the robbers. This question, too, is a matter within the discretion of the trial court. (*People v. Clair, supra*, 2 Cal.4th at p. 676.) We see no abuse of discretion.

As defendant argues, the eyewitness identification was, by itself, not very convincing. But far more than eyewitness identification evidence existed; very strong circumstantial evidence of defendant's identity as one of the robbers also existed. Within a very few minutes of the robbery, defendant and another man were trapped inside a nearby apartment with the stolen property. A rational juror could find unreasonable the possibility that during the few minutes between the robbery and the police securing the apartment, the real second robber had disappeared, and that an innocent defendant had somehow found himself in that apartment with the stolen property. This "evidence was sufficient to allow a rational trier of fact to determine beyond a reasonable doubt that defendant" was one of the Delano robbers. (*People v. Hart, supra*, 20 Cal.4th at p. 650.)

### 2. *Challenges to California's Death Penalty Law*

Defendant raises a number of contentions we have repeatedly rejected. We see no reason to reconsider our previous holdings.

Specifically, we reject defendant's arguments that (1) a broad application of section 190.3, factor (a) (allowing the jury to consider the circumstances of the crime in aggravation or mitigation) is unconstitutional (*People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244]); (2) the death sentence is unconstitutional because, except for unadjudicated criminal conduct and prior convictions, it is not premised on findings made beyond a reasonable doubt (*id.* at pp. 401–402); (3) Evidence Code section 520 requires an instruction on the prosecution's burden of proof or, alternatively, the court was required to instruct that there is no burden of proof (*People v. Dunkle* (2005) 36 Cal.4th 861, 939 [32 Cal.Rptr.3d 23, 116 P.3d 494]); (4) the jury must achieve unanimity as to the existence of the aggravating circumstances, including unadjudicated criminal activity (*People v. Brown, supra*, at p. 402); (5) use of the phrase "so substantial" in the standard jury instructions is unconstitutional (*People v. Page* (2008) 44 Cal.4th 1, 55–56 [79 Cal.Rptr.3d 4, 186 P.3d 395]); (6) the instructions unconstitutionally failed to inform the jury that it must determine whether death is the appropriate punishment (*id.* at p. 56); (7) the instructions unconstitutionally failed to inform the jury that it was required to return a verdict of life if it found that mitigation outweighed aggravation (*id.* at p. 57); (8) the instructions unconstitutionally failed to inform the jury regarding the standard of proof and lack of a unanimity requirement as to mitigating circumstances (*People v. Hawthorne* (2009) 46 Cal.4th 67, 104 [92 Cal.Rptr.3d 330, 205 P.3d 245]; *People v. Gutierrez* (2009) 45 Cal.4th 789, 831 [89 Cal.Rptr.3d 225, 200 P.3d 847]); (9) the court had to instruct the jury on the "presumption of life" (*People v. Gutierrez, supra*, at p. 833); (10) the jury must make written findings (*People v. Brown, supra*, at p. 402); (11) the use of the restrictive adjectives "extreme" and "substantial" in the list of mitigating circumstances is unconstitutional (*ibid.*); (12) the court was required to delete inapplicable sentencing factors from its instructions (*People v. Cook* (2006) 39 Cal.4th 566, 618 [47 Cal.Rptr.3d 22, 139 P.3d 492]); (13) the court was required to instruct the jury that certain statutory factors are relevant solely in mitigation (*People v. Hillhouse* (2002) 27 Cal.4th 469, 509 [117 Cal.Rptr.2d 45, 40 P.3d 754]); (14) intercase proportionality review is required (*People v. Brown, supra,* at p. 402);[7] (15) California's sentencing scheme violates equal protection guarantees (*People v. Manriquez* (2005) 37 Cal.4th 547, 590 [36 Cal.Rptr.3d 340, 123 P.3d 614]); and (16) California's death penalty law violates international law (*People v. Brown, supra*, at pp. 403–404).

---

[7] We do conduct *intracase* proportionality review to determine whether a sentence of death is disproportionate to the defendant's personal culpability. Defendant does not request such review, but it would not aid him. Already a veteran of violent criminal conduct, the 29-year-old defendant was clearly the leader, not a follower, in this crime. He involved a group of youths in the crime and induced the juvenile A.J. to participate. He and A.J. robbed, hog-tied, and murdered an elderly married couple in their own home. The death sentence is not disproportionate to defendant's personal culpability, and it does not shock the conscience. (*People v. Kelly, supra*, 42 Cal.4th at p. 800.)

D. *Cumulative Effect of Error*

Defendant argues that the cumulative effect of the alleged errors was prejudicial. We have found no error.

### III. CONCLUSION

We affirm the judgment.

Kennard, Acting C. J., Baxter, J., Corrigan, J., and George, J.,* concurred.

**WERDEGAR, J.,** Dissenting.—I do not agree with the majority's analysis and rejection of defendant's claim under *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] and *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. Defendant, an African-American man, killed two elderly White victims. When the prosecutor peremptorily challenged three of the five African-American prospective jurors, the trial court found a prima facie case of group bias and invited the prosecutor to explain his challenges. In response, the prosecutor offered for each challenge important, even dramatic reasons—reasons the record does not support. That the record does not support the prosecutor's reasons suggests they were pretextual, and pretextual reasons "naturally give[] rise to an inference of discriminatory intent." (*Snyder v. Louisana* (2008) 552 U.S. 472, 485 [170 L.Ed.3d 175, 128 S.Ct. 1203] (*Snyder*); see also *People v. Silva* (2001) 25 Cal.4th 345, 385–386 [106 Cal.Rptr.2d 93, 21 P.3d 769] (*Silva*).) Perhaps the prosecutor's reasons were truly pretextual; perhaps they reflect honest mistakes, as the majority generously assumes. We will never know, because the trial court neglected its duty to make " 'a sincere and reasoned effort to evaluate' " the proffered justifications. (*People v. Lenix* (2008) 44 Cal.4th 602, 614 [80 Cal.Rptr.3d 98, 187 P.3d 946] (*Lenix*); see also *Silva*, at p. 385.) Accordingly, the trial court's decisions to accept the prosecutor's reasons and to deny defendant's motion are not entitled to deference on appeal. (*Lenix*, at p. 614; *Silva*, at pp. 385–386.) Because the trial court's omission leaves the inferences of pretext and discriminatory intent unrebutted, I would reverse.

Prospective Juror N.C. was a 54-year-old African-American man with a high school diploma, a former assistant platoon sergeant with 19 years of Army service who was working at the time of trial as a hospital telephone operator. The prosecutor's "primary concern" about N.C. was his answer to the written question, "Have you, a close friend, or relative ever been accused of a crime, even if the case did not come to court?" N.C. circled "yes," wrote

---

*Retired Chief Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

his son's name, indicated he had not attended the trial, and left blank the question, "What crime(s)?" When the prosecutor cited this answer to justify striking N.C., he dramatically misstated the answer, telling the judge, "*I think it was attempt murder or murder.*" (Italics added.) The prosecutor in a capital case might well harbor serious reservations about a prospective juror whose son had been accused of murder, but N.C. had said no such thing. (See *Silva, supra,* 25 Cal.4th 345, 385 [justifications not supported by the record suggest pretext].) Neither did the prosecutor seek to clarify the matter by asking questions of N.C. during voir dire. (See *Miller-El v. Dretke* (2005) 545 U.S. 231, 246 [162 L.Ed.2d 196, 125 S.Ct. 2317] [state's failure to engage in meaningful voir dire on subject of professed concern suggests pretext].)

Prospective Juror G.G. was a 47-year-old African-American man with a high school diploma who had served with the Army in Vietnam and worked at the time of trial for the Riverside Transit Agency supervising 150 bus drivers. In attempting to justify his decision to strike G.G., the prosecutor explained to the court that he had, among other reservations, "concerns about this bus driver, *as well as other bus drivers*" (italics added), because local lighting conditions on the morning the crime occurred might be an issue at trial and bus drivers might have firsthand knowledge of the subject. A prosecutor could properly be concerned about a prospective juror having such knowledge, but the record does not support the prosecutor's assertion that he was concerned about bus drivers *other* than G.G. There were two other bus drivers on the panel: Both drove school buses in the neighborhood of the crime, both served on the trial jury without objection by the prosecutor, and both were White. (Cf. *Miller-El v. Dretke, supra,* 545 U.S. 231, 248 [that prosecutor's "reason also applied to . . . other panel members, most of them white, none of them struck, is evidence of pretext"].)

Prospective Juror D.L. was a 40-year-old African-American woman who had attended UCLA and was at the time completing an MBA program at another university. She worked as an insurance rate analyst, supervising a small unit of other employees doing similar work. Among the reasons the prosecutor gave for striking D.L. was that she was potentially controversial. She had, the prosecutor explained, "mentioned her church was A.M.E. [(i.e., African Methodist Episcopal)], and I assume that it's the A.M.E. church up in L.A. I constantly see A.M.E. on television. They are constantly controversial, and I don't particularly want anybody that's controversial on my jury panel." A prosecutor might reasonably hesitate to accept a "controversial" juror, and a person who would regularly travel over 60 miles from Riverside to Los Angeles to attend a "controversial" church might attract notice in a rural county. Of these assertions, however, the record supports only that D.L. had on her questionnaire claimed affiliation with the largely African-American A.M.E. church. The record does not show that D.L. attended a particular church in Los Angeles rather than one nearer her home in Riverside, that any

particular A.M.E. church or the domination as a whole is any way controversial, or that D.L. herself shared any supposed controversial views. Again, the prosecutor asked no questions of D.L. on this matter of supposed concern, bolstering the inference of pretext. (Cf. *Miller-El v. Dretke, supra*, 545 U.S. 231, 246.)

A trial court, having found that a prosecutor's peremptory challenges establish a prima facie case of group bias, has an obligation to make a sincere and reasoned effort to evaluate the prosecutor's justifications. (*Lenix, supra*, 44 Cal.4th 602, 614; *Silva, supra*, 25 Cal.4th 345, 385.) This the court below failed to do. The court asked a single question during the prosecutor's presentation, confirming that his "primary concern" about Prospective Juror N.C. was that his son had been "charged with a serious offense." The court, however, failed to note that (a) the record did not support the prosecutor's assertion that N.C.'s son had been accused of murder, attempted murder or any other "serious offense"; (b) the record contradicted the prosecutor's professed concern about *all* bus drivers (as opposed to G.G. only) having knowledge of local lighting conditions; and (c) the record did not support any of the prosecutor's assertions about D.L.'s supposed involvement with a "controversial" church. Having remained largely silent throughout the prosecutor's presentation, the court denied the *Batson/Wheeler* motion with an uninformative global finding to the effect that the prosecutor had excluded the three jurors for "racially neutral purposes."

Under these circumstances, we cannot appropriately defer to the trial court's ruling. Our unanimous decision in *Silva, supra*, 25 Cal.4th 345, explains why: "Although we generally 'accord great deference to the trial court's ruling that a particular reason is genuine,' we do so only when the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror. [Citations.] When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (*Id.*, at pp. 385–386.)

Here, the prosecutor gave for each of the three jurors reasons that were unsupported by the record. Given the trial court's failure to conduct a meaningful evaluation of the prosecutor's reasons, we have no basis for assuming that other, possibly neutral reasons actually motivated the three peremptory challenges in question. Furthermore, "when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis.

If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." (*Miller-El v. Dretke, supra,* 545 U.S. 231, 252.) This is especially true of the majority's continual references to the challenged prospective jurors' demeanor—a subject to which the prosecutor referred but on which the trial court made no findings entitled to deference. (Cf. *Snyder, supra,* 552 U.S. 472, 479; *Lenix, supra,* 44 Cal.4th 602, 619.)

Once again, to be clear, we do not and cannot finally know whether the prosecutor's unsupported assertions about Prospective Jurors N.C., G.G. and D.L. represented pretexts for group bias or honest mistakes. The trial court's failure to make " 'a sincere and reasoned effort to evaluate' " the prosecutor's justifications (*Lenix, supra,* 44 Cal.4th 602, 614; see *Silva, supra,* 25 Cal.4th 345, 385) leaves this court without a ruling entitled to deference (*Silva,* at pp. 386–387), and leaves the resulting inferences of pretext and discriminatory intent (*ibid.*; see *Snyder, supra,* 552 U.S. 472, 485) undisturbed. I therefore dissent.

Moreno, J., concurred.

Appellant's petition for a rehearing was denied March 30, 2011.