Filed 4/24/15  P. v. Myrick CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040129 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1199851) |
| v. | |
| MYKAL DURRELL MYRICK, | |
| Defendant and Appellant. | |

## I.  INTRODUCTION

Defendant Mykal Durrell Myrick was convicted after jury trial of second degree murder (Pen. Code, § 187).[1]  The jury further found true the allegation that defendant personally used a deadly and dangerous weapon, a knife, in the commission of the offense (§ 12022, subd. (b)(1)).  The trial court sentenced defendant to 15 years to life for the murder plus one year for the personal use allegation.

On appeal, defendant contends that the trial court abused its discretion and denied him due process when it admitted evidence of a prior grand theft that he had committed.  For reasons that we will explain, we will affirm the conviction.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged by information with the murder of Salvador Pena. (§ 187.) The information further alleged that defendant personally used a deadly and dangerous weapon, a knife, during the commission of the murder (§ 12022, subd. (b)(1)), and that the murder was committed while defendant was engaged in the commission and attempted commission of robbery (§ 190.2, subd. (a)(17)).

Prior to trial, defendant filed a motion seeking to exclude evidence of his prior convictions, including a 2010 conviction for grand theft from a person (§ 487, subd. (c)), pursuant to Evidence Code sections 1101 and 352, and on the grounds that admission of the evidence would violate his constitutional rights to due process and a fair trial.

The prosecution filed a motion seeking to introduce evidence of defendant's prior convictions and other bad acts for the purpose of impeaching defendant if he testified, and to show motive and intent pursuant to Evidence Code section 1101, subdivision (b). Regarding motive and intent, the prosecution argued that defendant committed the alleged murder during the commission of a robbery, and that therefore his intent to permanently deprive the victim of property by force or fear was at issue. The prosecution contended that defendant's prior conviction for grand theft from a person was relevant to show that defendant acted in the instant case with a similar intent to permanently deprive the victim of his property.

The trial court first determined that some of defendant's prior convictions, including grand theft from a person, were admissible for the purpose of impeaching defendant if he testified at trial. The court indicated that only the convictions themselves were admissible and not evidence concerning the underlying conduct. Second, with respect to the conviction for grand theft from a person, after undertaking an analysis under Evidence Code sections 1101 and 352, the court ruled that evidence concerning the incident underlying the grand theft conviction was admissible to show intent. Subsequently, after the prosecution had presented a substantial portion of evidence at

trial, the court, upon the request of the prosecution, further ruled that evidence of the prior grand theft was admissible to show motive.

**A.** *The Prosecution's Case*

### 1. The charged offense

The victim, Salvador Pena, owned a store in which he sold a variety of items, including jewelry, phone cards, and compact discs, and offered services such as check cashing and wire transfers. On the night of December 15, 2010, a witness, who worked in the area, saw a man with his back against the front glass door of the store looking back and forth. The lights were off inside the store, but a shadow could be seen moving around inside. After a few seconds, the man went inside the store. The witness immediately called 911 at 9:36 p.m. to report the incident and to provide a description of the man.

The police arrived at the store at 9:41 p.m. When the police opened the front door, the victim was on his knees about four feet from the door. He was fully clothed, with blood on his chest. He also appeared to have a severe leg injury.

The police tried to get the victim to come outside, but the victim fell forward in a prone position. The police flipped him onto his back and pulled him out of the business. As officers went inside the business, another officer attended to the victim. The victim had a stab wound in the abdomen and in the chest. The stab wound in the chest had a knife blade partially protruding out. The victim's right leg was fractured, and he had a small cut above the bridge of his nose.

In response to questions from the police, the victim indicated that his name was Salvador Pena and that he was the owner of the store. He was 56 years old. The officer asked what happened, who did this, and what the person looked like. Pena had difficulty breathing and talking. He indicated that he was closing the store when someone pushed him back in and took his keys. The assailant punched Pena in the upper body and stabbed him. The assailant asked for money and did not demand anything else. Pena told

the assailant that he did not have any money and showed the assailant his empty wallet. Pena reported to the police officer that he thought his wallet was in the store. Pena indicated that nothing else was taken. Pena gave a description of the assailant but never provided a name of the assailant.

Pena was taken to the hospital for surgery. He remained in the hospital, on a ventilator and unconscious, until he died on January 7, 2011.

Inside Pena's store, a display cabinet appeared to have been pushed off its base and compact discs were scattered on the floor. There were bloodstains on the carpet as well as a knife handle with the blade missing. The knife handle and some of the blood were near a locked screen door, beyond which was a back office area.

The secured, back office area appeared undisturbed. A shipment of jewelry, worth about $15,000 to $20,000, had arrived for the holiday season, and the victim had been weighing and pricing the jewelry during the prior two days. On a desk was a bag of "gold-type" jewelry. There were also two locked safes. One safe contained checks and cash totaling approximately $4,100, while the other safe contained "more expensive-type" alcohol.

In the main store area, large bags of coins were in plain sight and appeared untouched. A key was in the lock of a cash register, which appeared undisturbed. A loaded Beretta pistol was located under a counter near the register.

The police did not locate a wallet in the store. In addition, the victim's business key ring, which contained keys to the safes and to the front door of the store, was missing. At some point, the victim's relative found the victim's driver's license and credit cards, which had about $300 wrapped around them, hidden in a drawer in the store.

The victim's relatives continued operating the business after the victim died. When the police returned to the business on January 4, 2011, the police found a bag containing several packaged condoms and lubricant in an office desk drawer. The police had not previously checked the drawer.

4

Defendant was the source of the DNA found on the knife handle. The police also determined that there were phone calls between defendant and the victim during the months prior to the incident. On the night of the incident, around 9:13 p.m., the victim had called defendant's cell phone. Defendant's cell phone had been disconnected or was otherwise not in service.

Subsequent to the incident, in early February 2011, a traffic stop was conducted on a vehicle in which defendant was a passenger and his girlfriend was the driver. Defendant was not arrested and was free to leave. He agreed to wait for detectives who wanted to talk to him rather than meeting them at the police station. The detectives told defendant that they were investigating burglaries or robberies on the east side. Defendant was shown a picture of the victim and the victim's store. Defendant indicated that he was familiar with the area, but that he had not been inside the store and that the victim did not look familiar. Defendant went on his way after talking to the police.

Defendant was later arrested on the same date as the traffic stop. During an interview at the police department, defendant indicated that he was 28 years old. When the police told defendant that he had lied during the traffic stop about not knowing the man in the picture, defendant stated that he had seen the man in 2004, but that he did not actually know him. Defendant later admitted that the man was a good friend, that the two called each other on the phone, and that the man had helped defendant with money.

The police told defendant that they were investigating the assault of the man. Defendant eventually indicated that he was sexually involved with the victim and that the two engaged in oral sex. He stated that the victim took care of him, that he had feelings for the victim, and that he would not hurt the victim.

Defendant subsequently indicated during the police interview that, on the night of the incident, the victim had picked him up and they went to the victim's store. At the store, the victim tried to grab defendant and have anal sex, which was something they did not "normally" do. Defendant did not want to have anal sex and wanted the victim to get

5

away from him. Defendant stated that he did not intend to assault the victim. Defendant had a knife because he had problems with other people in the area. The knife was poking defendant, so he took it out and stabbed the victim. Defendant told the police that it was an accident and that he did not mean to hurt the victim. He also stated that he did not jump on the victim, did not break the victim's leg, and did not remember punching him.

Defendant stated that the victim fell backward. At some point, defendant asked the victim if he was "okay," and the victim responded, "Yeah" and "I'm okay." Defendant stated that he used the victim's keys to unlock the door to get out of the store, and that he threw or dropped the keys somewhere. Defendant denied taking anything else from the store. Defendant stated that he tried to call the victim later.

One of the police detectives who interviewed defendant testified that during the interview, defendant indicated that he and the victim had had anal sex at the store on the night of the incident.

The victim's nephew, who frequently helped in the store after school, testified that he had seen defendant in the store monthly and later every two months before the incident. Most of the time, defendant was complaining to the victim about financial issues and needing money from the victim. Afterward, the victim would appear really irritated about defendant wanting money.

Gustavo Betancourt Ortiz, a friend of the victim, testified that he had helped at the victim's store almost every week. The victim confided in Ortiz that he had been having a sexual relationship with defendant for a long time, and that the two engaged in oral sex.[2] Ortiz saw defendant in the store on three or four occasions asking the victim for money. The victim gave defendant small amounts, such as $5. The victim later told Ortiz that he believed defendant had stolen several thousand dollars in cash from the back office of the

---

[2] Ortiz's testimony about statements made by the victim were not admitted for the truth of the matter stated, but to show the victim's state of mind and/or explain the victim's subsequent conduct.

6

store in 2004. The victim indicated he was afraid of reporting defendant to the police because he believed defendant would retaliate when he got out of jail. The victim also stated that defendant had called him on the phone a couple of times asking for money and promising that he would treat the victim better. Ortiz testified that the victim had used a wallet in the past, but he did not know whether the victim had used a wallet recently.

## 2. The uncharged offense

The prosecution presented evidence that defendant had previously committed and been convicted of grand theft from a person. Prior to the introduction of this evidence, the trial court instructed the jury that if it found by a preponderance of the evidence that defendant committed the uncharged offense, it may consider that evidence for the purpose of deciding whether defendant acted with the intent to deprive Salvador Pena permanently of his personal property, specifically keys, money, and jewelry, or that defendant had a motive to commit the special circumstance allegation.

Cortland Johnson testified that on the evening of January 31, 2010, he parked his car in a parking lot near a bar. He met a person named Layton, and the two talked before going to sit in Johnson's car. Johnson sat in the driver's seat, and Layton sat in the passenger's seat. A friend of Johnson's sat in the back of the car, and Layton's friends were in the general area of the car.

At some point, Johnson was distracted by someone on the left side of his car, and then "all of a sudden, Layton wasn't sitting there anymore. Someone else was sitting there." The new person, who Johnson identified in court as defendant, grabbed Johnson's wallet from the center console, took $50 out, and became really aggressive, telling Johnson that he had a gun in his pants and that Johnson had to give him "everything or it was [his] life, basically." Defendant put his hands partially in his waistband and Johnson assumed defendant had a gun. Johnson was in shock and asked if defendant was serious. Defendant indicated he was serious and "started getting more infuriated." Johnson feared for his life. The person on the left side of Johnson's car opened the driver's side door and

7

told Johnson to get out. A friend of Johnson's approached the car and a fight broke out. Eventually defendant, Layton, and others left and the police arrived.

Defendant was arrested that night and later convicted on April 26, 2010, for grand theft from a person under section 487, subdivision (c). He served time in jail from February 1 through August 3, 2010.

### 3. Other prior convictions

Defendant was also previously convicted of misdemeanor petty theft in 2001 and 2006, and vandalism and second degree burglary, involving a commercial store, in 2008.

### B. *The Defense Case*

Defendant testified in his own defense. He had been in a sexual relationship with the victim since late 2003. They engaged in oral sex but never anal sex. Defendant had "a lot of financial issues," and the victim helped him with money for rent, groceries, or other items. The amount the victim gave depended on defendant's need and might include $200 if defendant was behind on rent.

Defendant testified that the day before the incident, he and the victim planned by phone to meet the following night. On the night of December 15, 2010, the victim drove to pick up defendant and they went to the victim's store. The victim went inside the store to turn off an alarm while defendant waited outside. Defendant admitted that he was the person who the witness had seen standing outside the store. Defendant testified that the victim unlocked the front door and defendant went inside the store.

Defendant testified that the victim indicated that he wanted to have anal sex. The victim tugged at defendant's pants and grabbed at defendant roughly and forcefully. Defendant did not want to have anal sex and told the victim "no." The victim did not answer defendant and continued to grab at defendant's upper body, tug at defendant's pants, and try to turn defendant around. Defendant tried to take the victim's hands off him but the victim's hands kept coming back onto defendant.

8

Defendant was able to get the victim a half foot away from him, but the victim came back at him. Defendant felt afraid. He thought the victim was "going to have his way" with defendant, even though defendant had told him "no." Defendant had brought a knife with him that night. He testified that the knife, which was in his coat pocket, was poking him so he pulled it out. When the victim came back at him, defendant "panicked" and stabbed him. Defendant testified that he did not stab the victim intentionally, and that it was a "reaction" when the victim came at him. Defendant testified that he might have "overreacted" out of panic.

Defendant testified that he brought the knife to protect himself because the area was not safe. He testified that there were times when the victim would not drive him home and he had to take the bus or light rail home.

Defendant denied being at the store that night to rob the victim. He also denied bringing the knife to stab or rob the victim. He further denied breaking the victim's leg or punching him.

Defendant testified that he lied to police during the traffic stop because his girlfriend was nearby. He did not want her to know about his sexual relationship with the victim or about the incident at the store. Defendant testified that after he was arrested, he told the police that the victim "was trying to do me in my ass. And they interpreted it as 'did' me in my ass, which is not true."

### C. *Verdicts and Sentencing*

The jury found defendant not guilty of first degree murder but guilty of second degree murder (§ 187), and found true the allegation that defendant personally used a deadly and dangerous weapon, a knife, in the commission of the offense (§ 12022, subd. (b)(1)). The trial court sentenced defendant to 15 years to life for the murder plus one year for the personal use allegation.

9

## III. DISCUSSION

### A. *Background*

Prior to trial, defendant filed a motion seeking to exclude evidence of his prior convictions, which included petty theft, commercial burglary, vandalism, and grand theft from a person, pursuant to Evidence Code sections 1101 and 352, and on the grounds that admission of the evidence would violate his constitutional rights to due process and a fair trial. In particular, regarding the prior grand theft from a person (§ 487, subd. (c)), defendant argued that it bore no similarity to the alleged murder because the prior offense involved the threat of a gun and a victim with whom the defendant had no prior relationship.

The prosecution filed a motion seeking to introduce evidence of defendant's prior convictions and other bad acts. First, the prosecution contended that defendant's prior conduct involved moral turpitude and was admissible to impeach defendant if he testified at trial. Second, relevant here, the prosecution contended that defendant's prior conviction for grand theft from a person was admissible to show motive and intent pursuant to Evidence Code section 1101, subdivision (b). In particular, regarding motive and intent, the prosecution argued that defendant committed the instant murder during the commission of a robbery, and therefore his intent to permanently deprive the victim of property by force or fear was at issue. The prosecution contended that the prior theft offense was "sufficiently similar" because in both cases defendant "caught the victim by surprise in a confined area (vehicle vs. business)," "demanded money in association with use of force (threat of force vs. actual force)," and "threatened [the] use of a weapon (gun vs. knife)," and both offenses occurred at night. The prosecution also argued that the evidence should not be excluded or limited under Evidence Code section 352.

The trial court first ruled that the prior conviction for grand theft from a person, as well as prior convictions for petty theft, vandalism, and second degree burglary, were

10

admissible for the purpose of impeaching defendant, although for this purpose the evidence would be limited to the fact of the convictions themselves.

Second, regarding admission of evidence under Evidence Code section 1101, subdivision (b), the court found that the only prior incident that was sufficiently similar to the prosecution's theory of the case was the prior incident involving defendant's grand theft from a person. The court characterized the prior offense as involving defendant accosting the victim and telling the victim that he had a gun, that he was not afraid to kill the victim, and that the victim had to give defendant everything the victim had. The court found the evidence was relevant and admissible on the issue of intent. The court also found that the evidence was not unduly prejudicial, that the presentation of the evidence would not unduly prolong the proceedings or confuse the issues, that the incident was not remote in time, and that the prior incident was less violent than the instant case. Subsequently, after the prosecution had presented a substantial portion of evidence at trial, the trial court, upon the request of the prosecution, ruled that evidence of the prior grand theft was also admissible on the issue of motive.

## B. *The Parties' Contentions*

Defendant contends that the trial court committed prejudicial error and violated his right to due process by admitting evidence of his prior grand theft under Evidence Code section 1101 to show motive or intent. He argues that the prior grand theft was not sufficiently similar to the alleged robbery to show that he probably harbored the same intent. He also argues that the evidence was unduly prejudicial within the meaning of Evidence Code section 352 because the evidence evoked "an emotional bias" against him and was likely used by the jury in a manner unrelated to the issue on which it was admitted.

The Attorney General contends that the trial court did not abuse its discretion in admitting evidence of the prior grand theft. The Attorney General argues that the prior offense was sufficiently similar to the alleged robbery and murder to raise an inference

11

that it was probably committed with the same intent or motive. In both instances, defendant was personally armed, he isolated his victim in a confined space at night, and he used violence, aggression, and the threat of violence to get what he wanted. The Attorney General also argues that the prior offense was not made inadmissible by Evidence Code section 352 because defendant was convicted for the prior offense and the prior offense was not as inflammatory as compared to the murder. Lastly, the Attorney General contends that any error was not prejudicial.

### C. *Analysis*

" ' "Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition . . . ." ' " (*People v. Thomas* (2011) 52 Cal.4th 336, 354 (*Thomas*).) Specifically, " '[s]ubdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of [Evidence Code] section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition.' [Citation.] 'Evidence that a defendant committed crimes other than those for which he is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity. [Citations.]' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 667 (*Fuiava*).)

"To be admissible, there must be some degree of similarity between the charged crime and the other crime, but the degree of similarity depends on the purpose for which the evidence was presented." (*People v. Jones* (2011) 51 Cal.4th 346, 371 (*Jones*).) "The least degree of similarity is required to prove intent or mental state." (*Thomas*, *supra*, 52 Cal.4th at p. 355.) "In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant

12

' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).)

" ' "There is an additional requirement for the admissibility of evidence of uncharged crimes: The probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury. [Citation.]" ' " (*Thomas*, *supra*, 52 Cal.4th at p. 354; see Evid. Code, § 352.) " 'Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." [Citation.]' [Citation.] ' "We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." [Citation.]' [Citation.]" (*Fuiava*, *supra*, 53 Cal.4th at pp. 667-668, fn. omitted.)

In this case, the uncharged offense was grand theft from a person and the charged offense was murder under a robbery-felony-murder theory. "Theft and robbery have the same felonious taking element, which is the intent to steal, or to feloniously deprive the owner permanently of his or her property. [Citation.]" (*People v. Bacon* (2010) 50 Cal.4th 1082, 1117.) In evaluating the relevance and probative value of the uncharged offense and the charged offense on the issue of intent in this case, we find *Jones*, *supra*, 51 Cal.4th 346, instructive on the degree of similarity required.

In *Jones,* the defendant was on trial for the first degree murders of an elderly married couple, the Florvilles, and the murders were allegedly committed while the defendant was engaged in a robbery and/or burglary. (*Jones*, *supra*, 51 Cal.4th at pp. 350, 351.) The evidence at trial ultimately showed that during the early morning in 1993, the 29-year-old defendant and a 15-year-old boy entered the home of the Florvilles, hog-tied them, stabbed them to death, and stole their property. (*Id.* at p. 351.)

13

On the issue of intent to steal, the prosecution presented evidence that in 1985, in Vernon, California, the defendant and another man robbed three men of their money at gunpoint. (*Jones*, *supra*, 51 Cal.4th at pp. 355, 370.) The robbery occurred as the three men were leaving work at a furniture store. (*Id.* at p. 370.) The defendant pointed a gun at the employees, said it was a robbery, demanded money, and threatened to kill them. The defendant's cohort took money from the three employees, hitting one of the employees in the process. The defendant was convicted of robbery. (*Id.* at pp. 356, 370.)

The California Supreme Court concluded that there was no abuse of discretion in admitting evidence of the prior Vernon robbery. (*Jones*, *supra*, 51 Cal.4th at p. 371.) On the issue of similarity of the crimes and relevance, the court explained: "The Vernon robbery and the Florville home invasion were not particularly similar, but they contained one crucial point of similarity—the intent to steal from victims whom defendant selected. Evidence that defendant intended to rob the Vernon victims tended to show that he intended to rob when he participated in the Florville crimes. This made the evidence relevant on that specific issue, which is all that the court admitted it for." (*Ibid.*)

Here, the uncharged offense of grand theft from a person and the charged offense of murder, under a robbery-felony-murder theory, involved victims in confined spaces, at night, with defendant personally armed, and with defendant demanding money in association with force. In view of the conclusion in *Jones* that an "intent to steal from victims whom defendant selected" was a sufficient degree of similarity to admit a prior robbery in a case involving a home invasion and murder (*Jones*, *supra*, 51 Cal.4th at p. 371), we determine that the shared characteristics between the uncharged and charged offenses in the instant case were sufficiently similar to support the inference that defendant probably harbored the same intent – to permanently deprive the victim of personal property – in each instance (*Ewoldt*, supra, 7 Cal.4th at p. 402). Therefore, we conclude that the trial court did not abuse its discretion in ruling that evidence of the prior

14

grand theft was admissible on the issue of defendant's intent. (Evid. Code, § 1101, subd. (b).)

Regarding whether the evidence should have been excluded because of prejudicial impact, we again find *Jones* instructive. In that case, the California Supreme Court disagreed with the defendant that the Vernon robbery should have been excluded as unduly prejudicial under Evidence Code section 352. (*Jones*, *supra*, 51 Cal.4th at p. 371.) Among other factors, the court explained that the Vernon robbery was not particularly inflammatory when compared with the "horrendous" facts of the charged murder crimes, the jury presumably followed the trial court's instruction on the proper purpose for which the evidence could be considered, defendant's conviction for the Vernon robbery eliminated any temptation by the jury to convict the defendant of the charged offenses in order to punish him for the prior robbery, and defendant's identity as one of the robbers in the charged offenses had already been established. (*Id.* at pp. 371-372.)

Here, the evidence regarding the prior grand theft from the victim Johnson was less inflammatory than the facts of the charged murder of Pena. The trial court also instructed the jury on the limited purposes for which the evidence of the grand theft could be considered pursuant to CALCRIM No. 375. The jury was told that, if the prosecution had proven by a preponderance of the evidence that defendant in fact committed the uncharged offense, the jury was not to conclude from this evidence that defendant has a bad character or is disposed to commit crime, but that it may only consider the evidence on the questions of intent to permanently deprive Pena of personal property; motive to commit the special circumstance allegation or the offenses of murder, robbery, or attempted robbery; or for determining defendant's credibility. Further, the jury was informed that defendant had been convicted of grand theft from a person for the prior incident, and thus "the jury would not be tempted to convict defendant of the charged offense[] in order to punish him for the previous crime." (*Jones*, *supra*, 51 Cal.4th at

15

p. 372.)  The identity of Pena's assailant was also not in dispute, as defendant's DNA was found on the knife handle and defendant admitted to the police that he had entered Pena's store and stabbed him.  Considering all these relevant factors, we conclude that the trial court did not abuse its discretion in determining that the probative value of the prior grand theft on the issue of defendant's intent was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice.  (*Id.* at pp. 371-372; Evid. Code, § 352.)

Because we determine that the trial court did not abuse its discretion under state law in admitting the evidence of the prior grand theft offense over defendant's objection, his contention that the admission of the evidence violated his constitutional right to due process is also without merit.  (See *People v. Rogers* (2013) 57 Cal.4th 296, 332; *Fuiava*, *supra*, 53 Cal.4th at p. 670; *People v. Riggs* (2008) 44 Cal.4th 248, 292.)

## IV.  DISPOSITION

The judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

MIHARA, J.

_____

MÁRQUEZ, J.