Filed 10/22/15  P. v. Yepez CA2/6
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FREDERICO YEPEZ,<br><br>    Defendant and Appellant. | 2d Crim. No. B259074<br>(Super. Ct. No. 1429721)<br>(Santa Barbara County) |

Frederico Yepez appeals from the judgment entered after a jury convicted him of two counts of robbery.  (Pen. Code, § 211.)[1]  The jury found true allegations that he had personally used a firearm.  (§ 12022.53, subd. (b).)  It was unable to reach a verdict on gang enhancement allegations.  (§ 186.22, subd. (b)(1)(C).)  Appellant was sentenced to prison for 19 years, four months.

The main issue at trial was the identity of the perpetrator of the robberies.  In a 145-page opening brief, appellant contends that (1) he was denied his constitutional right to effective assistance of counsel, (2) the trial court erroneously denied his motion to bifurcate the jury's determination of the truth of the gang enhancement allegations, (3) the trial court erroneously refused to exclude portions of a telephone conversation between him and his brother, (4) the trial court erroneously admitted evidence of a prior gang-

_____

[1] All statutory references are to the Penal Code unless otherwise stated.

1

related robbery that he had committed as a juvenile, and (5) he was denied due process of law because the trial court admitted an excessive amount of gang evidence. We affirm.

*Facts*

Appellant and his two brothers, Armando and Miguel, were members of the 18th Street gang, a criminal street gang. On December 12, 2012, Armando was convicted of murder with a gang enhancement. The murder was committed for the benefit of the 18th Street gang and was "an example of one of the primary activities of the . . . gang."

On December 27, 2012, after Armando had been convicted and while he was still in jail, law enforcement authorities recorded a telephone conversation between Armando and appellant. Armando said, "[L]et's . . .get . . . a lawyer to do my appeal." Appellant replied, "[W]e can pay somebody to do that . . . ." Armando said that it should cost "like five hundred bucks" for a lawyer to file the appeal. He declared, "Nothing is connecting me to the crime that they're accusing me of foo, there's nothing."[2] Armando complained that he did not "trust" his trial attorney.

Appellant told Armando: "Nigga you, don't worry about it you're gonna have money to eat nigga, you're gonna have money for everything, you don't have money nigga, you call nigga." "Just tell me foo, don't trip, don't trip foo, mandatory, *I'm from eighteen* foo [the 18th Street gang], I got you foo." (Italics added.)[3] "Hey, don't get sad dude, don't trip foo, I'm telling you, I got you foo." "[Y]ou are going to get out dude."

Armando stated: "Chuckie [Chuckie is the gang moniker of appellant's brother Miguel] is going to talk to you later, I'm going to make that dude go see you dude . . . ." "Just keep it in between you guys and that's it."

Appellant said that he was going to contact a female appellate attorney "to see how much is she talking about." Appellant wanted to "lay . . . some money down flat on her, so she tells me and, give her a heads up so she can study the entire case dude." Appellant

---

[2] A gang expert testified, "[F]oo comes from the word fool, which is the way a lot of times [gang members] refer to each other . . . ."

[3] A gang expert testified that, when appellant said, "I'm from eighteen," he was "admitting membership [in] the 18th Street gang."

2

said that the female attorney was a former federal judge who "got two friends out of the Feds dude." She "charged [the friends] a lot of money, foo, I know that for sure foo." Appellant assured Armando: "We got everything for you. . . . [M]e and Chuckie, we're gonna . . . one way or another foo and that shit's gonna be there foo, just know that foo . . . ."[4]

On December 29, 2012, two days after the telephone conversation, Miguel (Chuckie) took a silver Honda Accord that belonged to the mother of his girlfriend, Joana Esquivel. Esquivel was the mother of Miguel's two children. Before taking the Honda, Miguel said to Esquivel, "I'm going to go with my brother. I'll be back." Miguel left around 5:00 to 6:00 p.m. At about midnight Esquivel received a telephone call from Miguel, who said "that he was on a money mission." A gang expert testified that he had heard gang members use the term "money mission," which meant "a money task."

In the morning on January 1, 2013, appellant and Miguel's sister, Daisy, informed Esquivel that she had Esquivel's mother's car and car keys. The car was parked in an alley near Daisy's mother's residence. The car "was trashed." A few weeks later, Esquivel's mother received in the mail a traffic ticket for running a red light at 2:32 p.m. on December 31, 2012. The ticket was accompanied by a photograph of the Honda Accord when it ran the red light. Miguel was in the driver's seat and appellant was in the front passenger's seat.

At about 11:52 p.m. on December 30, 2012, Maria Garcia was robbed at gunpoint while working in a mini-market at a Shell gas station. The robber "had a hoody over his head," but Garcia got "a good look" at his face. The robber took about $300.

---

[4] Pursuant to Evidence Code sections 452, subdivision (d) and section 459, we take judicial notice that in an unpublished opinion this court affirmed Armando's convictions of first degree murder, attempted premeditated and deliberate murder, street terrorism, and assault with a firearm (three counts), with findings regarding firearm, great bodily injury, and criminal street gang enhancements, and a prior serious felony strike conviction. (*People v. Yepez* (Apr. 28, 2015) 2d Crim. No. B249483.)

3

A camera in the mini-market filmed the robbery, and the video was played for the jury. On January 8, 2013, sheriff's deputies showed a still image of the robber to Esquivel. "She burst into tears and started to yell out, 'They didn't do this, did they[?]' " Esquivel identified the robber as appellant. She said, "Yeah, that's him. Yeah, I'm sure." Esquivel told the deputies "that she believed that Miguel and [appellant] were on a money mission to obtain an appellate attorney or defense attorney for Armando, who was in on a murder charge."

On December 31, 2012, Garcia was shown a "photo array" that included a photo of appellant. She was unable to identify the robber. She said that a photo of a person named Robert Harper "looked like the robber." At trial Garcia testified that she "thought" appellant was the robber. She was "afraid to say this is the person" because she had "kids."

About 35 minutes after Garcia was robbed, Eddie Diamond was robbed at gunpoint while working at an AM/PM store that was about a 20-minute ride away from the Shell gas station. The robber took $415. He ran to a car, got in, and drove away. Diamond described the car as a "metallic and shiny" compact. "It looked to be silver or teal." The robber was wearing a hood over his head, a jacket with sleeves, and gloves.

Diamond saw the robber's face and at trial identified appellant as the robber. But in a photo lineup 10 days after the robbery, Diamond did not select a photo of appellant. Diamond testified, "There is something about [appellant] that makes me absolutely sure he was the gentleman that stuck a gun in my face." Diamond said that he was better at identifying people in person than in a photograph "[b]ecause when I see them in person, they're three dimensional and a photo is one dimensional."

A camera filmed the robbery at the AM/PM store. The video was played for the jury. In January 2013 Esquivel showed a still image of the robber to Manuel Escalera, who was living with Esquivel and her mother. At a barbecue in November 2012, Escalera had seen appellant wearing a long-sleeve sweatshirt "with a hoody." Escalera had seen appellant again in December 2012. Escalera told Esquivel that the robber

4

"remind[ed]" him of appellant. Esquivel said "that she thought that [the robber] was [appellant]."

On January 17, 2013, sheriff's deputies showed Esquivel still images of the robber of both the Shell gas station and the AM/PM store. Esquivel said: "Yeah, it's just his [appellant's] body. It's his body. And then his mustache, his face. It fits - yeah. Like the way he hunches. He hunches. . . . [¶] I cannot mistake the body type. . . . [H]e's chunky and he hunches." When the police showed her a still image of the robber's face that was "more clear than the other ones," Esquivel stated, "Yeah, that's his [appellant's] face." She said that Miguel has a black hoodie, "so if [appellant's] wearing one he's probably wearing Miguel's."

Esquivel expressed concern for her safety. She told the deputies that if appellant found out that she had identified him, "he would put a friggin' bullet in my friggin' head."

Sheriff's deputies also showed still images of the robber in both robberies to Felicitas Juarez. She has been living with appellant's uncle for 18 years and is the mother of his four children. Juarez identified appellant as the robber.

Appellant testified on his own behalf. He denied participating in the robberies.

*Procedural History*

There were two preliminary hearings. The complaint for the first preliminary hearing alleged gang enhancements. (§ 186.22, subd. (b)(1)(C).) The magistrate dismissed them for insufficiency of the evidence. (§ 871.) Pursuant to section 739, the People alleged the gang enhancements in the information. Defense counsel did not move to set aside the enhancements pursuant to section 995.

On the date scheduled for trial, appellant announced that he was ready to proceed and would not waive time. The trial court granted the prosecutor's oral motion to dismiss the information. The ground for the motion was that the People needed time to conduct "further investigation." Neither the prosecutor nor the court mentioned the statute pursuant to which the action was dismissed. We assume that it was section 1385, which authorizes the court to dismiss an action "upon the application of the prosecuting attorney, and in furtherance of justice."

5

The People subsequently filed a new felony complaint alleging the gang enhancements. At the preliminary hearing on the new complaint, appellant was held to answer as charged. The People filed an information incorporating the gang enhancements.

The case was tried to a jury that was unable to reach a verdict. The jury was deadlocked 11 to 1 in favor of guilt. The court declared a mistrial.

At the retrial, the jury returned guilty verdicts on the robbery charges and found the firearm enhancements true. But it was unable to reach a verdict on the gang enhancements. The same judge presided at both trials.

*Effective Assistance of Counsel*

First Gang Emhancements

Appellant contends that he was denied effective assistance of counsel because counsel failed to move to set aside the gang enhancements in the first information filed after the initial preliminary hearing. The standard for evaluating a claim of ineffective counsel is set forth in *Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 80 L.Ed.2d 674]: "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." We need not determine whether counsel was deficient for not moving to set aside the gang enhancements in the first information. Appellant was not prejudiced because the first information was dismissed on the People's motion pursuant to section 1385.

Second Gang Enhancements

For the first time in his reply brief, appellant argues that he was denied effective assistance of counsel because counsel failed to move to set aside the gang enhancements in the second information filed after the second preliminary hearing. The argument is forfeited because it was not raised in appellant's opening brief. (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.) In his opening brief appellant states: "Failure to assert a meritorious motion to dismiss gang enhancements pursuant to section 995 upon filing of the *first information* [not second information] was constitutionally deficient

6

performance." (Italics added.) "There was no evidence at the first preliminary hearing of the jail call evidence, that might support probable cause to find [appellant] and Miguel were hatching a plan to raise money for Armando's appellate defense."

The argument is also forfeited because appellant fails to present a summary of the relevant evidence presented at the second preliminary hearing. " 'The purpose of a motion to set aside the accusatory pleading under Penal Code section 995 is to review the sufficiency of the indictment or information on the basis of the record made before the grand jury in the one case or the magistrate at the preliminary hearing in the other.' " (*Stanton v. Superior Court* (1987) 193 Cal.App.3d 265, 269.)

Alleged 1387 Bar

Appellant contends that he was denied effective assistance of counsel because counsel failed to move to dismiss the gang enhancements in the second information filed after the second preliminary hearing. Appellant argues that a dismissal was required pursuant to section 1387, subdivision (a), which provides that "[a]n order terminating an action" pursuant to section 1385 or 871 "is a bar to any other prosecution for the same offense" if "the action has been previously [so] terminated." Although a gang enhancement is not an "action" or an "offense," the dismissal of the enhancement is treated as an order terminating an action within the meaning of section 1387. (*People v. Carreon* (1997) 59 Cal.App.4th 804, 808, 810.)

Appellant claims that the gang enhancements were twice terminated within the meaning of section 1387. The first termination allegedly occurred when the magistrate at the initial preliminary hearing dismissed the gang enhancements for insufficiency of the evidence pursuant to section 871. Despite this dismissal, pursuant to section 739 the People filed the first information with the gang enhancements. The second termination allegedly occurred when the first information in its entirety was dismissed pursuant to section 1385.

There was only one termination of the gang enhancements within the meaning of section 1387. The termination occurred when the trial court dismissed the first information pursuant to section 1385. "Section 739 . . . allows the prosecution to file an

7

information alleging charges that have been dismissed by the magistrate. In such a case it would appear that the magistrate's dismissal would not be '[a]n order terminating the action' as provided in section 1387." (*People v. Carreon*, *supra*, 59 Cal.App.4th at p. 807.) In *People v. Superior Court (Martinez)* (1993) 19 Cal.App.4th 738, 745, the court explained: "[T]he magistrate's dismissal under section 871 at the preliminary hearing does not terminate the action. The action continues with an information filed under the same case number pursuant to section 739. The action is not terminated at all if the superior court disagrees with the magistrate and denies a section 995 motion based on the evidence produced at the preliminary hearing. . . . In any event, the action remains alive at least *until* the superior court agrees with the magistrate's ruling and grants the defendant's section 995 motion. The action is terminated when the superior court dismisses the information pursuant to section 995 [or, as here, pursuant to section 1385]."

### *Bifurcation of Gang Enhancements*

Appellant argues that the trial court abused its discretion in denying his motion to bifurcate the jury's determination of the truth of the gang enhancements. With bifurcation, "guilt of the underlying charge[s] [would have been] tried first and the truth of the gang enhancement allegation[s] would [have been] tried only if, and after, the jury found [appellant] guilty." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048.)

A trial court has broad discretion to deny a defendant's motion for bifurcation of a gang enhancement. (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1050.) We review the denial for abuse of discretion. (***Ibid***.) The burden is on the defendant " 'to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' [Citation.]" (*Id*., at p. 1051.) "[E]vidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove . . . motive . . . or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be

8

necessary. [Citation.]" (**Id**., at pp. 1049-1050.) "Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged—a court may still deny bifurcation." (**Id**., at p. 1050.)

"We must evaluate motions for severance [of charged offenses] . . . in light of the showings then made and the facts then known. [Citations.]" (*People v. Balderas* (1985) 41 Cal.3d 144, 171.) The same rule should apply when we evaluate a pretrial motion for bifurcation.[5] At the hearing on appellant's motion for bifurcation, the prosecutor stated that the recorded telephone conversation between appellant and Armando "references gang affiliations and how it relates in terms of obtaining finances and doing this for 18th Street, so that goes directly to the motive to commit the crimes . . . ." The trial court observed: "Here, it appears to me, from having heard the evidence in the case once before and having had discussions with counsel in pretrial, that [a] nexus does exist [between the gang evidence and the robberies], because you have jail conversations days before the alleged robberies occurred, which would indicate a motive that, at the very least, may have a familial element, but also has a gang element. I think those are intertwined . . . ." The court asked defense counsel, "Are you suggesting that it might be within the Court's proper purview to allow the prosecution to argue a familial motivation for the commission of the offense, but not a gang purpose?" Counsel answered, "Yes." In denying the motion for bifurcation, the court declared: "You [defense counsel] think she [the prosecutor] shouldn't be allowed to get into gang evidence, and that's the fodder for your motion to bifurcate. I don't see how that can occur given the factual circumstances that exist in this case. I just don't think that you can separate out . . . gang evidence . . . ."

---

[5] "[S]everance requires selection of separate juries, and the severed charges would always have to be tried separately; a bifurcated trial is held before the same jury, and the gang enhancement would have to be tried only if the jury found the defendant guilty." (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1050.)

The trial court did not abuse its discretion.  " 'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citation.]" (*People v. Foster* (2010) 50 Cal.4th 1301, 1328-1329.)  The trial court reasonably concluded that gang evidence was admissible to show that appellant was particularly motivated to commit the robberies. Armando was not just appellant's brother.  He was also a fellow gang member, and he needed money to hire an appellate attorney.  At the first trial, a gang expert testified: "[I]n gang culture, loyalty to your gang is everything. . . . I've seen gang members stab their brothers at the direction of a gang.  I've read articles where gang members from 18th Street have testified in court that their loyalty to their gang is higher than their loyalty to their own mother . . . ."  "[I]n my training and experience, their loyalty to their gang comes before their family."

At the first trial the prosecutor asked the gang expert a hypothetical question incorporating facts similar to those in the instant case.  The expert opined that the robberies were committed "in association with the 18th Street gang" and for the benefit of the 18th Street gang.  The expert explained: The person committing the robberies is "attempting to help a fellow gang member who is incarcerated or who is convicted for a murder, and if you're able to fund an . . . appellate attorney for this person, and this person is free, now you're not only freeing a fellow gang member, but you're freeing someone with elevated status within the gang.  [¶] . . . This person that [is] free committed the ultimate way to prove your loyalty to the gang, which is a murder, so that would score points on the person committing the [robberies.]"  "The member committing [the robberies] also elevates [his] status within the gang as a person that [the] gang can depend on to commit crimes in their name.  It elevates the status of the gang member and it . . . upholds the violent image and reputation of the gang."  Accordingly, we reject appellant's contention that "the commission of the [robberies] . . . had no gang overtones whatsoever."

*Admission of Telephone Conversation between Appellant and Armando*

10

Defense counsel did not object to the admission of pages 17-38 and 74-84 of a redacted transcript of the telephone conversation between appellant and Armando. But counsel objected on relevance grounds to the admission of the conversation at pages 38 to 74 of the redacted transcript because it contained nothing "regarding getting money to assist with retaining an appellate attorney." Counsel asserted, "[E]ssentially from pages 38 to 74 of the transcript, there's nothing relevant having to do with attorneys, getting money for an attorney . . . ." The prosecutor protested that pages 38 to 74 contained references to Armando's need for money and appellant's gang affiliation. For example, at page 44 appellant told Armando, "Nigga you, don't worry about it you're gonna have money to eat nigga, you're gonna have money for everything, you don't have money nigga, you call nigga." At page 46 appellant said, "[D]on't trip foo, mandatory, I'm from eighteen [18th Street gang], foo, I got you foo." The trial court pointed out that at page 41 Armando had stated that he did not "trust" his trial attorney. In overruling defense counsel's relevance objection to the admission of pages 38 to 74, the court declared, "I simply don't agree with you that there's nothing of any relevance within the pages that you've referenced."

Appellant contends that the trial court abused its discretion in overruling counsel's relevance objection. We conclude that the court acted within its discretion. The trial court reasonably determined that pages 38 to 74 contained evidence relevant to appellant's alleged motive for committing the robberies. During closing argument, the prosecutor told the jury, "[T]he motive for both of these robberies was to obtain finances for an appellate attorney for the [appellant's] brother and fellow 18th Street gang member." "Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related. [Citation.] ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citations.]' [Citations.]" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167-1168; see also *People v. Martin* (1994) 23 Cal.App.4th 76, 81 ["Case law holds that

11

where evidence of gang activity or membership is important to the motive, it can be introduced even if prejudicial"].)

*Admission of Evidence of Prior Gang-Related Robbery*

Appellant argues that the trial court abused its discretion in admitting evidence of a prior gang-related robbery that he had committed as a juvenile. (When the instant robberies were committed, appellant was 23 years old.) The evidence showed that in July 2004 three 18th Street gang members, one of whom was appellant, had committed a robbery of Hector Garcia.

Garcia testified as follows: In July 2004 he was 15 years old. While he and his younger brother were walking home, three persons approached them. One of the persons was appellant. Garcia recognized appellant because he had seen him at school and in the neighborhood. Appellant was wearing a T-shirt and had made no attempt to disguise himself. He was not wearing a hat or a "hoody." Garcia saw the numbers "1" and "8" tattooed on his arms. One of the three persons pointed a firearm at Garcia's chest. Appellant and another person pushed Garcia to the ground and took his shoes, cellphone, and a plastic bag that contained a jersey. The three persons then ran away. Garcia never recovered the property taken from him.

Appellant testified that he had been charged with robbing Garcia, that he had "pled guilty," and that he had been committed to "a six-month camp program." But he was transferred to the California Youth Authority because he got into fights with other persons at the camp. He spent seven years, three months in custody and was not released until November 2011.

The trial court instructed the jury that it could consider evidence of the prior robbery for the limited purpose of deciding whether, as to the charged offenses, (1) appellant had the specific intent to deprive the owner permanently of his property, (2) appellant had "acted with the specific intent to assist, further, or promote criminal conduct by gang members," (3) appellant had a motive to commit the offenses "and the gang enhancements," and (4) appellant "had knowledge of identification procedures used by prosecution agencies, such as clothing and tattoo descriptions, to aid law enforcement

12

in identifying a particular individual as a perpetrator to a crime, and to explain [appellant's] alleged conduct in conformity with that knowledge."

"Evidence of other crimes is not admissible merely to show criminal propensity, but it may be admitted if relevant to show a material fact such as intent. [Citations.] To be admissible, there must be some degree of similarity between the charged crime and the other crime, but the degree of similarity depends on the purpose for which the evidence was presented. The least degree of similarity is needed when . . . the evidence is offered to prove intent. [Citation.] . . . The determination whether to admit other crimes evidence lies within the trial court's discretion. [Citation.]" (*People v. Jones* (2011) 51 Cal.4th 346, 371.)

"The [2004] robbery and the [instant robberies] were not particularly similar, but they contained [two] crucial point[s] of similarity - the intent to steal from victims whom [appellant] selected [and the involvement of other 18th Street gang members]. Evidence that [appellant] intended to rob [Garcia] tended to show that he intended to rob when he participated in the [instant] crimes. This made the evidence relevant on that specific issue . . . ." (*People v. Jones*, *supra*, 51 Cal.4th at p. 371.) Moreover, "[t]he fact that defendant previously committed a [robbery], under circumstances indicating that he did so for gang-related purposes, helped show that he likely committed the instant [robberies] for gang-related purposes." (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1212.)

Appellant contends that the trial court abused its discretion because the probative value of the prior robbery was substantially outweighed by the probability that it would cause undue prejudice. (Evid. Code, § 352.) We disagree. "The evidence was presented quickly, and the parties did not dwell on it. [The prosecutor's direct examination of Garcia comprises only 10 pages of the reporter's transcript.] The [2004] robbery was not particularly inflammatory when compared with the . . . facts of the charged crimes. The court instructed the jury on the proper purpose for which it could consider the evidence, which we presume the jury followed. [Citation.] The fact that [appellant] was [adjudicated a ward of the juvenile court for the] robbery reduced any prejudicial effect, as the jury would not be tempted to convict defendant of the charged offenses in order to

13

punish him for the previous crime . . . ." (*People v. Jones*, *supra*, 51 Cal.4th at pp. 371-372.)

Appellant "argues that only identity was actually disputed at trial, and he did not dispute the perpetrator's intent to rob [the victims]. Even if this is so, it is not dispositive. '[T]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense.' [Citation.]" (*People v. Jones*, *supra*, 51 Cal.4th at p. 371.) In any event, evidence of the 2004 robbery was properly admitted to show that appellant "likely committed the instant [robberies] for gang-related purposes." (*People v. Zepeda*, *supra*, 87 Cal.App.4th at p. 1212.)

Because evidence of the 2004 robbery was admissible to show appellant's intent and gang-related purpose in committing the instant robberies, we need not decide whether the trial court properly instructed the jury that it could consider the 2004 robbery for the purpose of determining "[w]hether [appellant] had knowledge of identification procedures used by prosecution agencies . . . ." If this instruction was erroneous, the error was harmless.

### *Excessive Gang Evidence*

Appellant asserts: "[T]here was such an excessive amount of gang evidence presented as to deprive [him] of his rights to a fair trial and due process of law." "The court abused [its] discretion in failing to act as the gatekeeper, to confine the prosecutor's presentation of gang expert testimonies and specific gang evidence as relevant to the material issues of this case." Appellant presents a 12-page summary of the excessive gang evidence that allegedly resulted in "overkill." With two exceptions, he does not show that he objected to the introduction of any of this evidence, let alone that he objected on the ground that the evidence was excessive. Appellant contends that "[t]he court erred in allowing the evidence over defense objections," but he does not support this contention with citations to the record.   " 'If a party fails to support an argument with the necessary citations to the record, that portion of the brief may be stricken and the

14

argument deemed to have been waived. [Citation.]' [Citations.]" (*Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 743.)

" ' " '[Q]uestions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court *on the ground sought to be urged on appeal.*' " ' [Citation.] . . . The failure to raise a specific objection to the admission of evidence results in forfeiture of appellate review. [Citation.]" (*People v. Nelson* (2012) 209 Cal.App.4th 698, 711.) "To the extent . . . [defendant] argues that due process required the court to exclude the evidence for a reason not included in the trial objection, that argument is forfeited because he did not object to the evidence on that basis at trial." (*People v. Partida* (2005) 37 Cal.4th 428, 431.)

We discuss the first of the two instances where appellant shows that he objected to the allegedly excessive gang evidence. The first instance was his pretrial objection to the admission of evidence of an "attempted assault or assault" that he had committed while in county jail awaiting trial on the instant robberies. According to the prosecutor's offer of proof, appellant "[b]roke away from custodial staff and entered the protective custody unit, [which] houses individuals who are either gang member dropouts or people who are cooperating with law enforcement, . . . and began yelling, " 'Fuck P.C., you're molesters, you're rapists.' " The prosecutor said that he wanted to introduce this evidence to show that appellant was an active 18th Street gang member who was seeking to "enhance[] his reputation and status within [the] gang." Defense counsel objected on Evidence Code section 352 grounds. Counsel declared: "[T]here's more than ample information for the gang expert to rely upon without having to get into the more recent incidences that occurred at the jail . . . ." "And so the question for me becomes . . . how many is enough? . . . So it just at some point feels like it's piling on."

The trial court replied, "I think" that the jail incident is "probative on the issue" of whether the instant robberies were committed "for the purposes of promoting a gang interest." But the court did not rule on appellant's objection. It stated: "I think I just have to wait and see how it [the evidence presented at trial] plays out . . . ." "[T]here has to be

15

a proper numerical limitation. I'll just have to wait and see what that is, and I'll preserve your objection on that issue as we proceed through the trial."

At trial the gang expert testified about the jail incident without objection from appellant. By failing to renew his objection when the expert testified and to press for a ruling on the objection, appellant did not preserve the issue for appeal. "A tentative pretrial evidentiary ruling, made without fully knowing what the trial evidence would show, will not preserve the issue for appeal if the appellant could have, but did not, renew the objection . . . and press for a final ruling in the changed context of the trial evidence itself. [Citations.]" (*People v. Holloway* (2004) 33 Cal.4th 96, 133.) Our Supreme Court has also noted that a properly made motion in limine to exclude evidence preserves the issue for appeal "[w]hen such a motion is made and denied." (*People v. Morris* (1991) 53 Cal.3d 152, 190, disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) Here, appellant's "motion in limine," i.e., pretrial objection to the admission of evidence of the jail incident, was never denied.

Even if appellant had timely renewed his objection to the expert's testimony about the jail incident, the trial court would have acted within its discretion if it had overruled the objection. The gang expert testified that appellant got "away from custodial staff" and "attempt[ed] to assault inmates in the protective custody unit." The expert opined that the incident showed he was "still supporting [the] gang lifestyle, [the] gang culture." The expert explained that gang members are "expected to attack or retaliate against people [such as those in protective custody] who are considered to be rats or snitches." If a jailed gang member attacked protective custody inmates, his standing within the gang and the gang's reputation would be enhanced. Thus, the jail incident was admissible to show appellant's loyalty to the gang. This supported the People's theory that the motive for the instant robberies was to obtain funds so that a fellow gang member could hire an appellate attorney.

Brother's Gang Related Offenses

Appellant objected to District Attorney Investigator Michael Hoier's testimony concerning gang-related offenses committed by appellant's brothers, Armando and

16

Miguel. The prosecutor argued that evidence of the brothers' gang-related offenses was admissible to establish the predicate offenses for the gang enhancements and to show the primary activities of the 18th Street gang. Defense counsel responded, "I don't have a quarrel with the [the prosecutor's gang] expert [Alfredo Aguayo] using those incidents as a basis for his opinion . . . ." But counsel did not want Hoier testifying about the incidents. The trial court stated, "I don't think there's a reasonable, cognizable objection to what the People want to put forth as evidence in order to meet their burden, so I'll note your objection and overrule [it] . . . ." We find no abuse of discretion in the trial court's ruling.

Even if the trial court had erroneously admitted the allegedly excessive gang evidence over appellant's proper objection, the error would not have resulted in a denial of due process. "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*. [Citations.]" (*People v. Partida*, *supra*, 37 Cal.4th at p. 439.) The allegedly excessive gang evidence did not so infect the trial process as to render it fundamentally unfair.

"Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test [*People v. Watson* (1956) 46 Cal.2d 818, 836]: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error. [Citations.]" (*People v. Partida*, *supra*, 37 Cal.4th at p. 439.) It is not reasonably probable that a result more favorable to appellant would have been reached if the allegedly excessive gang evidence had been excluded. There was overwhelming admissible evidence establishing appellant's identity as the perpetrator of the robberies. The jury was instructed that it "may not conclude from [the gang evidence] that the defendant is a person of bad character or that he has a disposition to commit crime." We presume that the jury followed this instruction. (*People v. Yeoman* (2003) 31 Cal.4th 93, 138-139.) We also consider that the jury viewed both the videos of the robberies and the still images of the robber. The jury was therefore able to make its own assessment whether appellant was the person depicted in the videos.

*Disposition*

17

The judgment is affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.


We concur:


GILBERT, P.J.


PERREN, J.

Frank J. Ochoa, Judge

Superior Court County of Santa Barbara

_____


Sylvia W. Beckham , under appointment by the Court of Appeal, for Defendant and Appellant.


Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Rama R. Maline and Esther Kim, Deputy Attorneys General, for Plaintiff and Respondent.